# In the United States Court of Federal Claims

No. 18-034C
(Filed January 31, 2020)
(Reissued Following Motion to Certify Interlocutory Appeal: June 10, 2020)[1]

| | |
|---|---|
| **HEALTHESTATE, LLC,**<br><br>*Plaintiff,*<br>v.<br><br><br>**UNITED STATES,**<br><br>*Defendant,*<br>and<br><br><br>**ASM RESEARCH,**<br><br>*Third-Party Defendant.* | **Keywords:** Motion to Dismiss, RCFC 12(b)(1), Subject Matter Jurisdiction, 28 U.S.C. § 1500, Government Proxy, *Res Judicata*, Copyright Infringement, Pending Claims, *United States v. Tohono O'Odham Nation*, 563 U.S. 307 (2011), *National Cored Forgings Co. v. United States*, 132 Ct. Cl. 11 (1955), *Davis v. United States*, 642 Fed. App'x 982 (Fed. Cir. 2016), *UNR Indus., Inc. v. United States*, 962 F.2d 1013 (Fed. Cir. 1992); Certification for Interlocutory Appeal |

*Bryant Steven Banes*, Neel, Hooper, & Banes, PC, Houston, TX, for Plaintiff.

*Alex Hanna*, Trial Attorney, Civil Division, *with whom were Scott Bolden*, of Counsel, *Joseph Hunt*, Assistant Attorney General, and *Gary Hausken*, Director, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*Ranganath Sudarshan*, Covington & Burling LLP, Washington, D.C., for Third-Party Defendant.

## MEMORANDUM OPINION AND ORDER

**Tapp,** Judge.

This case presents the issue of whether a contractor who transfers to the government copyrighted source code owned by another can bar an infringement action in this Court between the owner of the source code and the government. The contractor argues it was a government proxy authorized to claim or wield the authority of the United States for purposes of 28 U.S.C. 1500 which precludes, in some instances, dual litigation against the government and its proxies. The owner of the copyrighted material argues that not every contract with the government results in the contractor being entitled to claim or wield the authority of the United States. The Court must decide under what circumstances a proxy relationship exists. Is every contractor authorized

---

[1] This Opinion has been reissued pursuant to this Court's June 10, 2020 Order. (ECF No. 70)

to claim or wield the authority of the United States? Or must there be a more formal grant of authority by the United States?

On January 5, 2018, Plaintiff, HEALTHeSTATE, LLC ("HeS"), filed this suit against the United States ("the Government"), alleging one count of copyright infringement based on the Government's alleged unauthorized use of HeS's document management software. HeS's original complaint identifies as a defendant: "the United States government, including the Defense Health Agency and Department of Veterans' Affairs and any federal instrumentality, or other entity with government authorization and consent . . . ." (Compl. at 1–2, ECF No. 1).

On August 28, 2019, the Government notified ASM Research, LLC ("ASM") of its potential interest in this litigation as a third-party.[2] On October 9, 2019, ASM filed a Motion to Dismiss, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that this suit is barred by 28 U.S.C. § 1500 because of the still-pending action between HeS and ASM in Virginia state court that is based on the same operative facts as this case. (ASM Mot., ECF No. 37). Plaintiff filed its Response on November 6, 2019. (Pl.'s Resp., ECF No. 42). On November 20, 2019, ASM filed its Reply. (ASM Reply, ECF No. 46). The Government did not participate in briefing on this motion. For the reasons set forth below, ASM's motion is **DENIED**.

### I.    Background[3]

HEALTHeSTATE, LLC was founded in 2005 by United States military veterans to provide healthcare consulting services and products to the Government and private entities. (Def. Mot. Ex. A at 1–2). HeS's core product is an electronic health record ("EHR") tool "developed originally by the Government, then privatized and developed as a commercial off-the-shelf software product by HeS." (Compl. at 2).

In 2012, HeS entered into a subcontract agreement with ASM, under which HeS agreed to provide computer software services in support of ASM's prime contract with the U.S. Army for a veterinary records software platform.[4] (*Id.*; ASM Mot. at 4). Pursuant to the subcontract,

---

[2] ASM was notified of its potential interest as a third-party pursuant to RCFC Rule 14(c). (Def.'s Notice to ASM, ECF No. 33). "Under this court's third party statute [Rule 14], a third party defendant which becomes such pursuant to this type of notice is entitled to present its full defense to the plaintiff's claim." *Sun Shipbuilding & Dry Dock Co. v. United States*, 204 Ct. Cl. 915, 916 (1974).

[3] In the Court's June 17, 2019 Order and Opinion denying the Government's Motion to Dismiss, ECF No. 27 ("Opinion Denying Mot. to Dismiss"), the Court noted that despite the parties' multitude of filings, "much information of importance remains missing or unclear. Some of the dates, in this Order, for example, may not always seem to be in sync. The same may be true of other factual representations. But none of the inherent confusion has prevented a ruling on this preliminary motion." (Opinion Denying Mot. to Dismiss at 9). The confusion referenced in the Court's earlier opinion still remains but, similarly, does not preclude a ruling on this motion. However, because a § 1500 analysis focuses on the "state of things" at the time the suit is brought, *see Resources Invs., Inc. v. United States*, 785 F. 3d 660, 660 (Fed. Cir. 2015), the Court must look only to the Original Complaint, rather than HeS's First Amended Complaint.

[4] On December 13, 2013, ASM and HeS modified the subcontract to extend the period of performance from September 20, 2013 to May 7, 2014. (Compl. at 3).

HeS produced a modified version of its already-existing electronic health record ("EHR") product to facilitate management of veterinary records, resulting in the creation of a software known as Remote Online Veterinary Record or "ROVR." (Compl. at ¶¶ 4, 6). The subcontract provided that "'[t]he source code [for ROVR] was not to be used for any other purpose,' remained the property of HeS, and ASM[] was granted no license, except [as] necessary to perform the subcontract." (*Id*. at ¶ 6). Accordingly, "HeS is the sole authorized owner and copyright holder of the ROVR software and any underlying source code." (*Id*. at ¶ 5).

HeS's subcontract expired on May 7, 2014. (Compl. at ¶ 10). On May 27, 2014, without authorization and unbeknownst to HeS, ASM transferred the ROVR source code to the Defense Health Agency ("DHA"). (Compl. at ¶ 10). On May 29, 2014, the Government issued a Notice of Justification and Approval for a sole-source contract to ASM for "continued maintenance and technical support" of ROVR. (Compl. Ex. 7, ECF No. 1-7). The Government's justification for the sole-source award was that "ASM Research has proprietary rights to the basic software source code . . . . No other vendor can perform these tasks as they do not have access to the proprietary code." (*Id.*). On September 30, 2014, ASM was formally awarded the sole-source contract. (Third-Party Mot. to Dismiss at 4). Thereafter, ASM was awarded additional contracts relating to EHR systems. (*See* Compl. at ¶¶ 11–16).

On October 1, 2014, HeS contacted DHA asserting that it was the sole owner of the ROVR software and source code. (*See* Compl. Ex. 8, ECF No. 1-8). On January 28, 2015, DHA responded, professing confusion and uncertainty as to the owner of the ROVR source code. (Compl. at ¶ 14; Compl. Ex. 9, ECF No. 1-9). Nevertheless, DHA continued to use the software. (Compl. at ¶ 14).

HeS contends it had proprietary rights in ROVR which it licensed to ASM under the parties' subcontract. (Compl. at ¶¶ 4–7). On October 3, 2016, HeS initiated suit in Virginia state court against ASM (and a related corporate entity), alleging violations of the Virginia Uniform Trade Secrets Act, conversion, tortious interference, unjust enrichment, fraud, and civil conspiracy. (*See* Decl. of R. Sudarshan, ECF 37-1; *see generally* Def. Mot. Ex. A) On January 5, 2018, Plaintiff filed this action against the United States alleging copyright infringement. (*See generally* Compl.).

II. **Standard of Review**

The burden of establishing subject matter jurisdiction rests with the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Whether a court has jurisdiction is a threshold matter in every case. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). "If the Court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3).

When faced with a motion to dismiss for lack of subject matter jurisdiction pursuant to the RCFC Rule 12(b)(1), a court must assume that all undisputed facts alleged in the complaint are true and draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Moreover, the Court may look to evidence outside of the pleadings in order to ascertain the propriety of its

exercise of jurisdiction over a case. *Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part*, *Martinez v. United States*, 281 F.3d 1376 (Fed. Cir. 2002).

This Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). Such a waiver is found in 28 U.S.C. § 1498(b). This provision provides:

> [W]henever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement ....

28 U.S.C. § 1498(b).

### III. Discussion

In its Motion to Dismiss, ASM argues that this Court lacks jurisdiction to hear HeS's claims against the Government because 28 U.S.C. § 1500 imposes a jurisdictional bar where, as here, two suits are brought in different fora based on the same underlying operative facts. (ASM Mot. at 2, 8–16). ASM further argues that dismissing this action "pursuant to 28 U.S.C. § 1500 is consistent with the principles of *res judicata*." (*Id.* at 21–24).

In response, HeS argues that its two suits are not based on the same operative facts because "this case concerns conduct authorized by the Government and/or the Government's conduct whereas the Virginia lawsuit [concerns] . . . ASM[]'s misrepresentations and conduct." (Pl.'s Resp. at 2). HeS maintains that ASM's "status as a government contractor does not make that party an agent [or proxy] of the Government" for purposes of § 1500. (*Id.* at 7). Finally, HeS contends that the doctrine of *res judicata* is not implicated here. (*Id.* at 36–38). The Court agrees with HeS.

#### A. Section 1500

The Supreme Court has explained that "[s]ince 1868, Congress has restricted the jurisdiction of the [Court of Federal Claims] and its predecessors when related actions are pending elsewhere." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 310–11 (2011) (hereinafter "*Tohono*"). The origin of 28 U.S.C. § 1500 can be traced back to the Reconstruction era. During the Civil War, the Captured and Abandoned Property Collection Act of 1863, ch. 120, 12 Stat. 820 (1863), allowed for the seizure and use of private property in rebel territory for use by the Union during the war. Unused property was sold at auction, and the proceeds deposited in the Treasury. David Schwartz, *Section 1500 of the Judicial Code and Duplicate Suits Against the Government and Its Agents*, 55 Geo. L. J. 573, 575 (1967). Those with ownership claims to the seized property (usually cotton) were provided with a remedy in the Court of Claims, provided they could affirmatively prove that they had "never given any aid or comfort to the present rebellion." Act of 1863, ch. 120, 12 Stat. 820. These so-called "cotton

claimants" often had trouble proving their Union loyalty in the Court of Claims, and therefore turned to other courts where they presented common law claims against individual federal officials, particularly treasury officials. Schwartz, 55 Geo. L. J. at 575–77.

In response, Congress amended the Act to include Section 8, a predecessor to 28 U.S.C. § 1500 ("Section 1500"). Act of June 25, 1868, § 8, 15 Stat. 75, 77 (1868). Its purpose, like that of the modern § 1500, was "to curb duplicate lawsuits brought by residents of the Confederacy" against the Federal Government. *Tohono*, 563 U.S. at 311–12; Schwartz, 55 Geo. L. J. at 574–80. 28 U.S.C. § 1500 extends the preclusive principles of *res judicata* to require an election between similar but separate suits against the United States and individual Government officials or agencies. *See National Cored Forgings Co. v. United States*, 132 Ct. Cl. 11, 17–18 (1955); *United States v. County of Cook, Ill.*, 170 F.3d 1084, 1090–91 (Fed. Cir. 1999). Section 1500, in its current form, provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C. § 1500 (1992). The statute has been interpreted as a "broad" jurisdictional bar when a related suit is pending elsewhere against a person who was "claiming or wielding federal authority" at the time the cause of action arose. *Tohono*, 563 U.S. at 312–13. The Supreme Court has explained that this is not a description of identity, but one of conduct. *See id*. at 312.

Thus, under § 1500, dismissal is compulsory when its three requirements are satisfied. First, the defendant-party in the two lawsuits must be: (1) the United States; (2) a party who acts directly or indirectly under the authority of the United States; or (3) a party who professes to act under the authority of the United States. 28 U.S.C. § 1500. Second, the claim pending in front of the Court of Federal Claims must share the same operative facts as that of the claim pending against the United States or an authorized party elsewhere. *Id*. Third, the other claim must be pending elsewhere at the time suit is filed in the Court of Federal Claims. *Id*. All three requirements must be satisfied for § 1500 to apply.

B.  *ASM as a Government Proxy.*

Section 1500's jurisdictional bar is not limited exclusively to actions against the United States, but also extends to government "proxies." *Tohono*, 563 U.S. at 312; *see also Nextec Applications, Inc. v. United States*, 114 Fed. Cl. 532, 537 (2014) ("[Section 1500] prevents a plaintiff from pursuing what is essentially the same case in multiple jurisdictions against the United States or its proxy."). However, the parties disagree on what specifically is necessary for a private party to be considered a government proxy for the purposes of § 1500.

ASM argues that a private party "act[s] or profess[es] to act, directly or indirectly under the authority of the United States," such that it may be considered a government proxy, when the conduct giving rise to a claim occurs in performance of a government contract and with the

authorization and consent of the Government. (Third-Party Mot. to Dismiss at 16, 19). As such a party, ASM contends that it was a government proxy for the purposes of § 1500. HeS, on the other hand, argues that status as a government contractor does not make a party a government proxy and aptly points to the dearth of case law where private parties successfully invoked the § 1500 defense. (Pl.'s Resp. at 5–6).

Indeed, although the Federal Circuit has been presented with numerous opportunities to examine other aspects of § 1500, such as when a case is "pending" and whether the facts in the two suits "substantially overlap," there is little guidance regarding when a party is a government proxy. *See, e.g.*, *Philbert v. United States*, 779 F. App'x 733, 737 (Fed. Cir. 2019) (affirming dismissal under § 1500 where Plaintiff's suit against the Secretary of the U.S. Department of Veterans Affairs, was pending in district court); *Beberman v. United States*, 755 F. App'x 973, 974 (Fed. Cir. 2018), as amended (Nov. 5, 2018) (finding the plaintiff's actions against the State Department and the United States were not "for or in respect to" the same claims, thus § 1500 did not apply); *Davis v. United States*, 642 F. App'x 982, 983 (Fed. Cir. 2016) (district court complaint named the U.S. Secretary of Agriculture in his official capacity and four other officials in their individual capacities). The common thread from these cases is that an agency or department of the United States were named as the defendant in the pending action and thus, status as a party "acting or professing to act, directly or indirectly under the authority of the United States" could not be legitimately disputed. Other cases involved two suits against the United States, where the application of the statute was even clearer. *See, e.g.*, *Rojas-Vega v. United States*, 782 F. App'x 994 (Fed. Cir. 2019) (CFC suit dismissed because the "pending" district court suit was "based on substantially the same operative facts"); *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370 (Fed. Cir. 2017) (same); *Brandt v. United States*, 710 F.3d 1369, 1380 (Fed. Cir. 2013) (same).

Looking to the plain language and history of § 1500, a private entity does not become a government proxy merely by performing under a contract with the Government. Instead, to be classified as a "government proxy" for the purposes of § 1500, a party's role as a direct or indirect source of government authority must be incidental to some formal grant of power found in the Constitution, the United States Code and its authorized regulations, or some other proclamation carrying the force of federal law. *See Davis v. United States*, 642 Fed. App'x 982, 985 (Fed. Cir. 2016) (affirming dismissal of suit against USDA employees for actions taken pursuant to their roles as government officials); *Oakland Truck Sales, Inc. v. United States*, 138 Ct. Cl. 63 (1957) (finding a German public corporation was not acting under the authority of the United States when it complied with orders from the U.S. Government to withhold the delivery of military surplus goods purchased by the plaintiff); *Nat'l Cored Forgings Co. v. United States*, 132 Ct. Cl. 11, 17–19 (1955) (emphasizing the importance of acting pursuant to statutory authority to gain protection of § 1500). In other words, a private party must be formally authorized to *wield* or claim government authority to invoke the protection against duplicative litigation provided by § 1500. A review of the history and purpose of this statute supports this conclusion.

The aim of the original statute as amended in 1868—which reads almost identically to § 1500 today—was to prevent duplicative suits against the Government.[5] *See Tohono*, 563 U.S. at 315. When the amended statute was passed, its sponsor, Senator George Edmunds of Vermont, explained:

> The object of this amendment is to put to their election that large class of persons having cotton claims *particularly, who have sued the Secretary of the Treasury and the other agents of the Government* in more than a hundred suits that are now pending, scattered over the country here and there, and who are here at the same time endeavoring to prosecute their claims, and have filed them in the Court of Claims, so that after they put the Government to the expense of beating them once in a court of law they can turn around and try the whole question in the Court of Claims. The object is to put that class of persons to their election either to leave the Court of Claims or to leave the other courts. I am sure everybody will agree to that.

81 Cong. Globe, 40th Cong., 2d Sess. 2769 (1868) (emphasis added).

The most formative case on § 1500 from the modern era is *Tohono O'Odham Nation v. United States*, 563 U.S. 307 (2011). In *Tohono*, the Tohono O'Odham Nation (the "Nation"), a federally recognized Indian Tribe, brought two suits based on the nearly identical alleged breaches of fiduciary duties relating to the Nation's lands and other assets. *Id*. at 309. The Supreme Court examined whether § 1500 barred the suit in the Court of Federal Claims because it was based on the same set of operative facts alleged against federal officials in U.S. District Court for the District of Columbia. *Id*. Although the Nation sought equitable relief in District Court and monetary damages in the Court of Federal Claims, the Court held that the suits alleged a substantial overlap of operative fact, thus the Court of Federal Claims suit was barred by § 1500. *Id*. at 318. The Court engaged in scant discussion of what it meant to act "under the authority of the United States" because that element of § 1500 was not in legitimate dispute—the Nation brought suit in District Court against the Secretary of the Interior, the Special Trustee for American Indians, and the Secretary of the Treasury. *See generally Tohono O'Odham Nation v. United States*, 556 F.3d 1284 (Fed. Cir. 2009). The Supreme Court explained that § 1500 "refers to a person who acts under color of federal law in respect to a cause of action at the time it arose"

---

[5] The Federal Circuit summarized the lineage of the statute in *UNR Indus., Inc. v. United States*:

> Section 8 was thereafter incorporated into the Revised Statutes of 1874. The few changes made to it then were not intended to alter its meaning in any way. Section 8 was renumbered as section 1067. . . . After the turn of the century, section 1067 was adopted without change as section 154 of the Judicial Code of 1911. . . . As part of the revision of the Judicial Code in 1948, Congress essentially reenacted section 154. . . . Thus, three changes were made to the statute. First, the language "or in the Supreme Court on appeal therefrom" was deleted as "unnecessary." Second, the phrase "against the United States" was added, making it clear that dual litigation against the United States, as well as against a federal officer, was barred. The third change was that the language "No person shall file or prosecute" was replaced by "The United States Court of Claims shall not have jurisdiction," confirming the jurisdictional bar against the Court of Claims earlier set out by the Supreme Court in *Ex Parte Skinner & Eddy Corp.*, 265 U.S. 86, 95 (1924).

962 F.2d 1013, 1018–19 (Fed. Cir. 1992) (citations omitted).

and that to act under the color of federal law, the person must be "claiming or wielding federal authority in the relevant factual context." *Tohono*, 563 U.S. at 312. However, the Supreme Court's guidance on this matter arose in the context of deciding whether the two claims needed to arise merely from the same facts, or whether they must arise from the same facts and necessitate the same relief. *Id*. So ended the Supreme Court's discussion of what it meant by "acting under the color of federal law" leaving lower courts with little guidance regarding when a party acts "under the authority of the United States."

In one of the earliest cases interpreting the modern iteration of § 1500, the Court of Claims considered whether the Reconstruction Finance Corporation ("RFC"), a corporation constituted by the Government under the Veterans Emergency Housing Act to "underwrite or guarantee markets for new type building materials and prefabricated houses," was acting under the authority of the United States. *See Nat'l Cored Forgings Co. v. United States*, 132 Ct. Cl. 11 (1955). Operating as a government corporation, RFC entered into several "market guarantee" contracts with a private corporation that became the subject of two separate lawsuits: one in U.S. District Court for the District of Columbia and the other in the Court of Claims. *Id*. at 15.[6]

The Court of Claims found that the RCF was a government proxy for the purposes of § 1500, holding that government corporations with powers vested in them by an act of Congress are government proxies "when their acts are within [their] statutory authority[.]" *Id.* at 18. The Court explained: "[w]hen a Government corporation acting within the scope of its statutory authority makes a contract as the agent of the United States, the United States may be sued in this court as principal on the contract[]" but that "does not mean that the corporation may not be sued for its action." *Id*. The Court went on to reason that, by acting pursuant to its statutory authority, the RFC contracted "both in its corporate capacity *and* as an agent of the United States" such that § 1500 might apply. *Id*. at 19 (emphasis added). In reversing its earlier decision, the Court distinguished between entites acting in their corporate capacity and those acting pursuant to statute, finding § 1500 applicable only to the latter. *Id*. at 17–18.

*Nat'l Cored Forgings* also examined *First Nat'l S.S. Co. v. United States*, 90 Ct. Cl. 632 (1940). In *First Nat'l S.S.*, the Court considered whether the United States Shipping Board and the United States Shipping Board Merchant Fleet Corporation (among other parties) were acting under the authority of the United States for the purposes of § 1500. 90 Ct. Cl. at 933. Congress established the United States Shipping Board in 1916 "for the purpose of encouraging, developing, and creating a naval auxiliary and naval reserve and a merchant marine" to meet the national defense and foreign and domestic commerce prior to the United States' entry into World War I. Shipping Act of 1916, 64 P.L. 260, 39 Stat. 728. The Shipping Board was empowered to create corporations to purchase, construct, and maintain merchant vessels during peacetime, hence the organization of the Fleet Corporation. *See* § 11, 39 Stat. at 731. The Fleet Corporation was organized as a corporation under the laws of the District of Columbia and initially capitalized entirely by the Shipping Board, although it later had private shareholders. *See First*

---

[6] After World War II, a housing shortage was exacerbated by veterans returning to civilian life. Market guarantee contracts sought to increase and stabilize the production of housing materials during this time to boost housing supply. *See generally* William Remington, *The Veterans Emergency Housing Program*, 12 Law & Contemp. Probs. 143 (1947).

*Nat'l S.S.*, 90 Ct. Cl. at 634; *see generally U.S. Shipping Bd. Merchant Fleet Corp. v. Harwood*, 281 U.S. 519 (1930). Shortly after the United States entered the war, the President conferred his war powers on the Fleet Corporation, through the Shipping Board, by executive order. Exec. Order No. 266, July 11, 1917.

Private commercial shipping companies brought suit in U.S. District Court for the District of Columbia to recover their deposits with the Shipping Board and the Fleet Corporation. *First Nat'l S.S.*, 90 Ct. Cl. at 633. These companies brought similar suit against the United States in the Court of Claims. *Id*. The United States raised the predecessor to § 1500 as a defense to the Court of Claims suit. *Id*. In determining whether the suit in D.C. District Court was against a party acting under the authority of the United States, the Court looked to whether the plaintiff had, in the District Court, pleaded the Fleet Corporation was acting under the authority of the United States or in its corporate capacity. *Id*. at 634.

The Court of Claims found the D.C. District Court suit was against the Fleet Corporation in its corporate capacity. *Id*. ("[The] suit is against the Fleet Corporation in its corporate capacity alone, not against it as an agent [of the United States.]"). Thus, the Court of Claims held the Fleet Corporation was not acting under the authority of the United States. *Id*. ("An examination of the petitions shows that different defendants are sued in the respective cases and, as we think, upon different grounds.").

*Nat'l Cored Forgings* later abrogated that decision. 132 F. Supp. at 458. But the error in *First Nat'l S.S.* was in the result, not the reasoning: although the Court properly and instructively distinguished between acting in a corporate capacity and acting as an agent of the United States, the Court failed to consider that the Fleet Corporation was a government corporation acting according to the authority conveyed by statute *and* by executive order. The Shipping Board and the Fleet Corporation, like the RFC, were government corporations, not private entities. *See* 44 Stat. 1083. Like the RFC, they were established by the United States for purely governmental purposes. Shipping Act of 1916, 64 P.L. 260, 39 Stat. 728. Therefore, on this same basis, the *Nat'l Cored Forgings* Court later held that the RFC fell within the scope of § 1500, and likewise, so should have the government corporations in *First Nat'l S.S.* 132 Ct. Cl. at 458. As the Court of Claims later explained, "*National Cored Forgings* was the logical extension of two prior cases which laid a foundation for the theory that the United States was responsible in the Court of Claims for the contract breaches of a 'corporation . . . created solely to perform governmental objectives.'" *Nat'l State Bank v. United States*, 174 Ct. Cl. 872, 878 (1966) (quoting *Crooks Terminal Warehouses, Chicago, Ill., v. United States*, 92 Ct. Cl. 401, 414 (1941)).

The natural continuation of this principle is that liability of the United States may exist where the United States is exercising its authority through another entity, be it a government corporation like RFC or the Fleet Corporation, or a government official in the case of the cotton claimants. But indemnification by the United States is not dispositive, even where such indemnity is created by treaty. In *Oakland Truck Sales v. United States*, 138 Ct. Cl. 63 (1957), the plaintiff brought suit after the United States prevented it from taking possession of American military surplus items the plaintiff purchased from a German corporation. The German corporation, "STEG" (and later, "TREUAG") was formed by the German Government and operated as a distributor of these surplus items. *Id*. at 64. The German corporation sold these items while they were still located at American Army camps in Germany. *Id*. After title passed,

the plaintiff attempted to take possession of the items, but was prevented from doing so by the American Army, which also instructed the German corporation not to deliver the items. *Id*. at 64–65. The plaintiff then demanded compensation from the American Government and the German corporation. *Id*. at 65. The plaintiff filed suit against the German Corporation in German courts, and in the Court of Claims against the United States. *Id*.

The United States sought dismissal of the Court of Claims action under § 1500, citing agreements between the United States and the German Government under which the United States would assume financial responsibility for any judgment awarded to the plaintiff in the German courts. *Id*. In citing these agreements, the United States argued that the German corporation was a person acting under the authority of the United States for the purposes of plaintiff's litigation in the German courts. *Id*. The Court of Claims disagreed, finding § 1500 inapplicable because "neither the [German] corporation nor its government was an agency of the United States." *Oakland Truck Sales*, 138 Ct. Cl. at 66. The Court concluded that even with the United States' assurances to effectively indemnify the German government, the German corporation was not acting under the authority of the United States under § 1500 when it declined to convey possession "unless the word 'indirectly' is to be given an almost unlimited meaning." *Id*. Further, the Court reasoned that dismissal of the suit in the Court of Claims under § 1500 could leave the plaintiff without remedy and it was "not disposed to stretch the meaning of section 1500 to produce [that] result." *Id*. at 66–67 ("The United States would have taken the plaintiff's property, the Statute of Limitations would have run against a suit in this court, and the plaintiff would have no remedy anywhere.").

The clearest application of § 1500 occurs when officials of the United States are sued in their individual capacities. In *Davis v. United States*, this Court dismissed a suit brought against the Government, through the United States Department of Agriculture (USDA), in connection with the denial of a loan subordination request, where the plaintiff brought a parallel suit in district court against four USDA officials in their individual capacities for the same underlying conduct. 123 Fed. Cl. 235 (2015), *aff'd*, 642 Fed. App'x 982, 985 (Fed. Cir. 2016). The Court rejected the plaintiff's argument that the district court litigation was a *Bivens*[7] action and thus not a suit "pending against the United States or its agents" for purposes of § 1500, reasoning that in both complaints, "the named defendants . . . were acting or professing to act, directly or indirectly under the authority of the United States at the time that plaintiff's claims arose." *Id.* at 240. The Court noted that in the suit against the USDA officials, the complaint stated that "plaintiff's claims against these defendants arose when . . . managing plaintiff's loan subordination request on behalf of the USDA" and "characterizes the conduct that gave rise to these claims as the actions of either the USDA or the [Farm Service Agency]." *Id.* at 241. The Court explained that in so doing, "plaintiff acknowledges that the defendants named in his district court complaint were acting under the authority of the United States." *Id.*

In a case from our predecessor court, *Hill v. United States*, 8 Cl. Ct. 382 (1985), the Court examined whether a civil rights suit brought against officials of the Department of Defense, Department of the Army, and the Army Reserve in U.S. District Court for the Eastern District of

---

[7] "Under *Bivens*, a person may sue a federal agent for money damages when the federal agent has allegedly violated that person's constitutional rights." *Davis v. United States*, 123 Fed. Cl. 235, 240 n.3 (2015) (internal quotations and citations omitted); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

New York precluded suit against the United States in the Claims Court. To "effectuate the purpose of [Section 1500] in preventing duplicative suits" against the United States, the Court queried whether the defendants in each suit were "sufficiently similar to come within [Section 1500]." *Id*. at 388 (capitalization altered). The Court determined § 1500 applied "when the United States is sued [in the Court of Federal Claims] and any person who was acting under the authority of the United States is the defendant in another court in his/her *official capacity*." *Id*. (emphasis in original). Thus, suing an individual acting in his or her official capacity equates to suit against a defendant "sufficiently similar" to the United States such that the duplicative protections of § 1500 apply.

From these cases, it follows that a private corporation, such as ASM, can be subject to suit for its conduct as a prime contractor in its corporate capacity while the Court of Federal Claims retains jurisdiction over a tangential action against the United States. Section 1500 bars duplicative suits against the government but does not protect non-government contractors that have no authority to wield the force of government. *See Tohono*, 563 U.S. at 313.

ASM urges a literal reading of the statute wherein "any person" is construed infinitely and "professing to act . . . under the authority of the United States" encompasses even the most tenuous connection to sources of federal authority. (*See* ASM's Mot. at 16–20). But such a reading "would thwart the obvious purpose of the statute." *Reid v. Department of Commerce*, 793 F.2d 277, 281–82 (Fed. Cir. 1986) (citing *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978)). Therefore, the literal interpretation must "be eschewed in favor of resort to the legislative history" to effectuate the intent of Congress. *Reid*, 793 F.2d at 281–82 (citing *United States v. Oregon*, 366 U.S. 643 (1961)). As discussed above, the statute has undergone few changes since its inception in 1868. *See Tecon Engineers, Inc. v. United States*, 170 Ct. Cl. 389, 398 (1965) ("[W]e conclude that there is no evidence of any intent of Congress at any time to change the legal effect of the original Section 8 of the Act of June 25, 1868."). The intent of § 1500 was to prevent duplicative litigation against the United States by precluding suits in the Court of Federal Claims when federal officials were named as defendants in similar suits elsewhere. *Tohono*, 563 U.S. 307, 310–11 (2011). There is no indication that the intent of § 1500 has changed through the years. *See Tecon Engineers*, 170 Ct. Cl. at 392–99 (discussing the legislative history of amendments to § 1500 and examining minor changes to the language of the statute); *see also Tohono*, 563 U.S. at 315 ("the statute's purpose is clear from its origins with the cotton claimants—the need to save the Government from burdens of redundant litigation—and that purpose is no less significant today.").

Here, unlike the treasury officials of the post-Civil War era statute or the government corporations established and managed according to an act of Congress, ASM can neither claim nor wield federal authority, other than that which it is contractually delegated. Like the German corporation in *Oakland Truck Sales*, ASM was operating pursuant to an agreement with the United States which may confer liability on the Government, but ASM is not itself exercising the authority of the United States. ASM is not a government-chartered corporation, an extension of the United States Government, or a government official being sued in either an individual or official capacity. ASM was merely a private corporation providing a product or service to the Army. It had no legitimate basis to claim or wield the authority vested in the federal government by the Constitution, statutes and regulations enacted thereunder, or some other source with the power of federal law. *See Davis v. United States*, 642 Fed. App'x 982, 985 (Fed. Cir. 2016);

11

*Oakland Truck Sales, Inc. v. United States*, 138 Ct. Cl. 63 (1957); *Nat'l Cored Forgings*, 132 Ct. Cl. at 17–19. The contract is not itself a source of federal authority and, consequently, ASM's status as a government contractor affords it no more authority than the terms of the contracts it is awarded.

To this end, ASM is not a "person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States" within the meaning of 28 U.S.C. § 1500. To find otherwise would stretch the statutory meaning of indirect authority far past any fair interpretation.

ASM contends that when HeS pleaded that its rights in a copyrighted work were infringed on by the United States "and those acting with the authorization and consent of the government," (namely ASM in this suit), HeS necessarily conceded ASM was acting "directly or indirectly under the authority of the United States" for purposes of the Virginia state court action. (*See* Def. Mot. at 19–20). In other words, since HeS identified ASM in pleading its § 1498(b) claim against the United States in this suit, ASM believes it must be considered a government proxy for purposes of the Virginia state court action such that the § 1500 jurisdictional bar applies. The Court disagrees.

Principally, ASM's argument ignores that § 1500 requires a comparison of the causes of action in different suits to determine whether the United States is subject to suit in multiple fora based on the same wrong. Here, two separate suits are at issue: one against the United States for copyright infringement and one against ASM for various state law claims. The suit against ASM in state court does not allege copyright infringement under § 1498(b) as a cause of action. By cherry-picking language from § 1498 and § 1500, ASM conflates the causes of action in these suits and misconstrues the very statute it seeks to invoke. Consequently, even if the Court were to accept ASM's argument—that ASM is considered a government proxy for purposes of the copyright infringement action in this Court because it is identified in HeS's pleadings[8]—ASM would still need to prove it was a government proxy for the causes of action alleged in the state court action for the § 1500 jurisdictional bar to apply.

The cases ASM relies on in support of its argument do not dictate otherwise. In *Ensign-Bickford Aerospace & Defense Company v. United States*, the Court considered whether the plaintiff's patent infringement claim against the United States was barred by § 1500 because in a separate suit, the plaintiff asserted a counterclaim of infringement against a subcontractor based on the subcontractor's alleged "use and manufacture" of the infringing product for the Government. 118 Fed. Cl. 363 (2014). Ultimately, the Court determined that § 1500 did not bar the suit because "the 'cause[s] of action alleged' in those counterclaims were not against the United States or against [the subcontractor] acting or professing to act under the authority of the United States."[9] *Id.* at 368–69. The Court noted that, although the subcontractor was ultimately immune from suit in district court because all of the alleged infringements in that case occurred

---

[8] There is no need to decide whether ASM is a government proxy for purposes of this action because the suit is clearly against the United States.

[9] The Court also found § 1500 did not bar the suit because the counterclaim in U.S. District Court was not "pending" at the time the plaintiff brought suit in the Court of Federal Claims. *Ensign-Bickford*, 118 Fed. Cl. at 368.

in connection with uses that were authorized or consented to by the United States, that did not transform the suit into one against the United States or its proxy," *i.e.*, a person acting under the authority of the United States for the purposes of § 1500. *Id*. at 369–70 (favorably comparing *d'Abrera v. United States*, 78 Fed. Cl. 51, 58–59 (2007), *rev'd on other grounds* (holding that a copyright infringement claim against an individual in district court did not bar the Court of Federal Claims' jurisdiction over a copyright infringement claim against the United States because in the case before the district court, plaintiff alleged that the individual acted on his own, and in the case before the Court of Federal Claims, plaintiff alleged that the individual acted as an agent of the United States)). Instead, the Court looked to whether the claim alleged in the earlier district court suit was framed as a cause of action against the United States or its proxy, and determined it was not. *Id*. at 370.

Here, the "cause[s] of action alleged" by HeS in the Virginia suit are not against the United States or its proxy, *i.e.* a person acting "under the authority of the United States." The gravamen of the Virginia state court complaint is that ASM "converted HeS's proprietary software to [its] own use" and "incorporate[d] it into [its] solicitations of new business."[10] (Def. Mot., Ex A at 2). On that basis, HeS stated causes of action for violations of the Virginia Trade Secrets Act, conversion, fraud, conspiracy, tortious interference, and unjust enrichment. (*See generally*, Def. Mot., Ex. A).

In general terms, HeS's claim under the Virginia Trade Secrets Act requires HeS to show ASM misappropriated a HeS-owned trade secret by theft, misrepresentation, and/or breach of duty. *See* Va. Code § 59.1-338. In its complaint, HeS alleges that "ASM's current use of ROVR has come by theft, misrepresentation, and/or breach of duty to maintain its secrecy[.]" (Def. Mot., Ex. A at 12). HeS does not allege ASM's theft, misrepresentation, or breach of duty occurred "under the authority of the United States." (*See id*. at 13–14). Thus, this claim was not framed as one against the United States or its proxy.

HeS's conversion claim turns on whether ASM engaged in a course of conduct purposefully designed to conceal ASM's taking and use of a HeS trade secret. (Pl.'s Resp. at 32–33). In its complaint, HeS alleges "ASM engaged in a course of conduct designed to purposely conceal its taking and/or use of ROVR and thereby wrongfully exercised and assumed authority over ROVR, depriving HeS of access to the servers on which ROVR is hosted." (Def. Mot. Ex. A at 15–16). That allegedly deceitful course of conduct is not alleged to have occurred under "the authority of the United States." (*See id.* at 15 ("ROVR was wrongfully converted by ASM and implemented in its own commercial efforts.")). Thus, this claim was not framed as one against the United States or its proxy.

The tortious interference claim arises from ASM's alleged wrongful use of ROVR to deny HeS potential business opportunities. (*Id*. at 8–12, 17–19). In its complaint, HeS alleges "ASM has used HeS's proprietary ROVR software to solicit prospective clients of HeS. ASM has done so with the specific intent to harm HeS's prospective business relationships and to erode HeS's goodwill with prospective clients." (*Id*. at 17–19). This alleged wrongful conduct is

---

[10] HeS's complaint alleges substantially identical causes of action against both ASM and its related entity, Accenture. For simplicity, the Court will refer to the causes of action as being directed against ASM and Accenture collectively, except when referring to claims specific to each defendant in their separate capacities.

not alleged to have occurred "under the authority of the United States." (*See id.* ("ASM's actions were and are without privilege or justification")). That some of those potential business opportunities *may* have included contracts with the United States is irrelevant. The inquiry is focused on the cause of action itself, not the origin of the potential business opportunities that are alleged to have been interfered with.

HeS's unjust enrichment claim seeks to recover the profits ASM derived from its alleged misappropriation of HeS's trade secrets. (*Id*. at 19–20). In its complaint, HeS alleges:

> ASM acknowledged repeatedly that HeS owned ROVR, and that ASM was permitted to use ROVR only if ASM paid compensation to HeS. Nevertheless, after its rights to use ROVR expired, ASM held itself out to the government as the sole source and owner of ROVR in securing a new government contract. ASM has been unjustly enriched under this new contract by receiving payment from the government for services tied entirely to ASM's unlawful operation of ROVR. ASM has retained the benefits of this wrongful conduct at the expense and to the detriment of HeS.

(*Id.* at 19). Whether those profits are derived from government contracts or otherwise is irrelevant to HeS's claim. The cause of action arose when ASM allegedly misappropriated HeS's trade secrets, and, as discussed in relation to the Virginia Trade Secrets Act claim, the misappropriation is not alleged to have occurred under the authority of the United States. Although ASM argues it was obligated to transfer the ROVR source code to the United States after its original contract expired, this does not mean ASM was acting "under the authority of the United States" when this claim arose. The cause of action is directed to ASM misappropriating ROVR to secure a "new contract." Thus, this claim is not directed against the United States or its proxy.

HeS's common law fraud claim alleges ASM intentionally deceived HeS to HeS's financial detriment. (*Id*. at 20–22). In its complaint, HeS states ASM intentionally deceived HeS and "ASM intended for HeS to rely on its misrepresentations so that it could pass ROVR off as its own program and exclude HeS from future business opportunities . . . ." (*Id.* at 21). This allegedly fraudulent conduct does not turn on the authorization and consent of the United States. (*See id.*). Rather, this cause of action is tied to ASM's alleged deceitful conduct in connection with "*future* business opportunities." (*See id.* (emphasis added)). Thus, this claim is not directed against the United States or its proxy.

Finally, HeS alleges both common law civil conspiracy and statutory civil conspiracy under Va. Code. §§ 18.2-499, 500. (*Id.* at 22–25). These causes of action are directed to the "defendants" named in the complaint: ASM and Accenture. (*See id.*). Specifically, HeS alleges: "Defendants conspired . . . to injure HeS in its business and/or trade," and caused HeS "to become excluded from contracts." (*Id.* at 22). The United States is not a party to the Virginia suit and thus, is not named as a "defendant." (*See id.* at 2). Thus, this cause of action is not directed against the United States or its proxy. Rather, these claims are clearly brought against ASM and Accenture in their corporate capacities.

14

In sum, none of the causes of action alleged in HeS's Virginia suit are against the United States or its proxy. ASM is not a government-chartered corporation, an extension of the United States Government, or a government official being sued in either an individual or official capacity. ASM was merely a private corporation providing a product or service to the Army. It had no legitimate basis to claim or wield the authority vested in the federal government by the Constitution, statutes and regulations enacted thereunder, or some other source with the power of federal law. *See Davis v. United States*, 642 Fed. App'x 982, 985 (Fed. Cir. 2016); *Oakland Truck Sales, Inc. v. United States*, 138 Ct. Cl. 63 (1957); *Nat'l Cored Forgings*, 132 Ct. Cl. at 17–19. As such, ASM is not a "person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States" within the meaning of 28 U.S.C. § 1500. Therefore, § 1500 does not bar this case.

C.  *Res Judicata*

In light of the history discussed *supra*, the Court notes that this result is consistent with the preclusion principles that § 1500 was enacted to address. *See Matson Nav. Co. v. United States*, 284 U.S. 352, 355–56 (1932) (citing the statements of Senator Edmunds quoted *supra*), *superseded by statute*, Act of Jun. 25, 1948, ch. 646, § 1500, 62 Stat. 942. In the context of § 1500, these principles are unique to the Government and officers acting in an official capacity. *See Tohono*, 563 U.S. at 315 ("The jurisdictional bar in § 1500 was enacted in part to address the problem that judgments in suits against officers were not preclusive in suits against the United States."). As § 1500 has remained substantially unchanged since it was enacted, it follows that the modern statute operates to accomplish those same goals.

*Res judicata* is premised on the concept that repetitive suits involving the same cause of action between the same parties or their privies should be barred once a court of competent jurisdiction has entered a final judgment on the merits. *Tohono*, 563 U.S. at 315; *see also Comm'r v. Sunnen*, 333 U.S. 591 (1948). "The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment." *Sunnen*, 333 U.S. at 597. This principle is inapplicable when the parties are distinct and the two suits seek recovery for distinct conduct.

ASM urges the Court to look to overlapping facts to determine the application of *res judicata* but fails to appreciate that ASM and the United States are distinct parties, each alleged to have committed a distinct wrong for which HeS seeks recovery. A judgment against ASM in Virginia would be a different judgment for a different wrong than the relief HeS seeks here, which is monetary damages from the United States. The Government is not in danger of double liability. The defendants are distinct entities that acted independently to produce two separate causes of action that the plaintiff has chosen to litigate in different fora. For these reasons, there is no merit to ASM's argument that applying § 1500 would comport with the principles of *res judicata*.

Moreover, incident to the Government's limited waiver of sovereign immunity, the Court of Federal Claims is granted exclusive jurisdiction to hear copyright claims against the United States. *See* 28 U.S.C. § 1498; *Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav.*

*Bank*, 527 U.S. 627, 648 n. 11 (1999). If the United States is the alleged infringer, the plaintiff "*must* sue the Government in the United States Court of Federal Claims[.]" *Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1859 (2019) (emphasis added); 28 U.S.C. § 1498(b). Accordingly, the Court of Federal Claims is the only forum in which a private party may seek and obtain redress for infringing activities by the Government.

This means that HeS is incapable of maintaining suit against the Government in Virginia because the United States has not consented to suits for monetary damages in state court for copyright infringement. The Government's limited waiver of sovereign immunity narrows the fora in which HeS might seek redress for copyright infringement damages to the Court of Federal Claims. Precluding such a suit in this Court would effectively bar HeS from suing the Government for its alleged misconduct anywhere. Thus, barring this claim under § 1500 would not only be unsupported by the doctrine of *res judicata*, but would also work manifest injustice against HeS.

### IV. Conclusion

Section 1500 affords protection from duplicative litigation exclusively to the United States and persons acting under color of federal authority. ASM's conduct undertaken in performance of its contracts with the United States does not satisfy this requirement. Thus, § 1500 does not bar HeS's action against the Government in this Court. This result is consistent with the doctrine of *res judicata*.

### V. Certification for Interlocutory Appeal

The court finds that this opinion involves controlling questions of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the opinion may materially advance the ultimate termination of the litigation.

**IT IS SO ORDERED.**

                                                             s/   David A. Tapp
                                                          DAVID A. TAPP, Judge