## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| HEALTHeSTATE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-34C |
| | ) | |
| v. | ) | Filed: November 20, 2023 |
| | ) | |
| THE UNITED STATES, | ) | Re-issued: December 15, 2023[*] |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ASM RESEARCH LLC, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff HealtheState filed this action against the United States and ASM Research ("ASM") alleging breach of contract and copyright infringement of its commercial software. Two software programs are at issue. The first is the software known as HEALTHeSTATE ("HeS"), which Plaintiff developed. The second is the HEALTHeSTATE Veterinary Electronic Medical Record ("HeVEMR"), also known as the Remote Online Veterinary Record ("ROVR"), which Plaintiff and ASM developed under a subcontract supporting ASM's prime contract with the Government. According to Plaintiff, the copyrighted baseline code of HeS is wholly incorporated into ROVR. Plaintiff contends that the Government, namely the Defense Health Agency ("DHA"), and ASM breached the limited license granted by Plaintiff to ASM. It further contends that Defendants misused Plaintiff's proprietary source code when in 2014 ASM delivered the

---

[*] The Court issued this opinion under seal on November 20, 2023, and directed the parties to file any proposed redactions by December 4, 2023. As the parties did not propose any redactions, the Court reissues the opinion publicly in full.

ROVR software to the Government with government purpose rights and the Government then awarded ASM a sole-source contract to support DHA's use of ROVR.

Before the Court are the parties' Cross-Motions for Summary Judgment on Plaintiff's breach of contract claim and copyright infringement claim, as well as Defendants' *Daubert* Motion to Exclude Expert Opinions and Motion to Strike Second Expert Report and March Declaration of Dr. Johnette Hassell.  For the reasons discussed below, the Court **GRANTS** Defendants' Motion for Summary Judgment on the Breach of Contract Claim, **GRANTS** Defendants' Motion for Summary Judgment on the Copyright Claim, and **GRANTS IN PART** and **DENIES IN PART AS MOOT** Defendants' *Daubert* Motion related to Dr. Hassell.  The Court further **DENIES** Plaintiff's Motion for Summary Judgment on the Breach of Contract Claim and Motion for Summary Judgment on the Copyright Claim.

## I. BACKGROUND

### A.     Factual Background

Plaintiff was founded in 2005 as a veteran-owned business, providing healthcare consulting services and products.  Pl.'s Cross-Mot. for Summ. J. on Breach of Contract Claim ("PMSJK") at 8, ECF No. 148; PMSJK Ex. 5 at 115, ECF No. 148-2.  Its initial core product, HEALTHeFORCES ("HeF"), was a computer software program originally developed by the Government and used at the Walter Reed Army National Medical Center in the early 2000s.  ECF No. 148-2 at 125 (Ex. 7).  HeF began as an outcomes management program, later expanded into a women's health application, and by 2004 had developed into a basic ambulatory electronic health record ("EHR").  PMSJK Ex. 58 at 568, ECF No. 148-4.  As an EHR, HeF provided healthcare providers with limited access to healthcare records in multiple federal military databases, as well as some display and reporting functions, for human patients.  ECF No. 148 at 8.

2

Between 2006 and 2011, Plaintiff executed a series of one-year contracts with the Department of Defense to perform software development, training, and implementation services to adapt HeF to rural and medically underserved civilian communities, as well as contracts, allegedly involving private funds, with Wheeling Jesuit University.  ECF No. 148-4 at 569 (Ex. 58); ECF No. 148-2 at 119–21 (Ex. 6) (September 2006 to September 2007 contract with Air Force, FA7014-06-C-8005; November 2007 to May 2008 contract with Wheeling Jesuit University, NTTC No. 0000006043; June 2008 to June 2009 contract with Army Natick Contracting Division, W911QY-08-C-0062; September 2009 to September 2010 contract with Army Natick Contracting Division, W911QY-09-C-0128; September 2010 to March 2011 contract with Army Natick Contracting Division, W911QY-10-C-0216; November 2010 to December 2011 contract with Wheeling Jesuit University, NTC No. 0000007167).  During that time, Plaintiff released several iterations of the software.  ASM's Mot. to Refer Questions to Reg. of Copyrights Ex. 23 at 3, ECF No. 146-24.  In 2011, Plaintiff completed two iteration updates (iterations 10 and 11), including extensive software development and full regression testing culminating in a baseline product commercially licensed to private organizations.  ECF No. 148-4 at 569 (Ex. 58); *see* ECF No. 146-24 at 3.  The baseline product version is HeS version 5.2, iteration 11 ("Build 252").  Defs.' Cross-Mot. for Summ. J. on Breach of Contract Claim ("DMSJK") Ex. 3 at 8, ECF No. 145-7; *see* ECF No. 146-24 at 3.

On June 8, 2010, while it was performing under a different government contract, Plaintiff sent a letter to Darlene Rideout at the United States Army's Natick Contracting Division, notifying her that Plaintiff (a) "inadvertently did not assert any restricted rights to the software that is being modified" under contract #W911QY-08-C-0128, (b) found through a financial and development history review of the software that it had "an infusion of $500,000 in private funds in January of

2007," and (c) "develop[ed] segregable portions of the software entirely at private expense." PMSJK Ex. 28 at 272, ECF No. 148-3.   As such, pursuant to Defense Federal Acquisition Regulation ("DFARS") 252-227.7014(e)(3), Plaintiff asserted "[r]estricted [r]ights for the software modules created exclusively with private funds." *Id.*  Included with the letter was a "breakdown of development tickets from [Plaintiff's] system for the subject modules." *Id.* at 272–73.

Separately, in 2008, ASM contracted with the United States Department of the Army for the development of the Veterinary Services System Management ("VSSM") program.  ECF No. 148-4 at 321, 390 (Ex. 54).  The VSSM was intended to be a web-based automated system providing an EHR for government-owned animals. *Id.* at 390.  On April 18, 2012, the Government issued a cure notice to ASM threatening termination for default because ASM had failed to perform the contract and deliver a satisfactory product. *Id.* at 538–40 (Ex. 55).  In response, ASM advised the Army of its intention "to right[] the course of this program," acknowledging the performance deficiencies and proposing to configure an existing EHR software as the solution. *Id.* at 543–44 (Ex. 56); *see id.* at 568–72 (Ex. 58); ECF No. 148-2 at 22, 26, 34–36 (Ex. 3).

On October 4, 2012, Plaintiff entered into a subcontract agreement with ASM, wherein it would support ASM as the prime contractor, in the development of the VSSM by providing its preexisting commercial software, HeS Build 252. ECF No. 148-4 at 575, 580 (Ex. 59).  Together ASM and Plaintiff developed a modified version of HeS, resulting in the creation of ROVR, which allows Army veterinarians to create and update treatment records for animal patients on an internet-accessible website. *Id.* at 390–93 (Ex. 54), 580 (Ex. 59), 644–45 (Ex. 62).   The subcontract between Plaintiff and ASM further provided that (a) neither party granted to the other "by implication or otherwise, any license" except as necessary to perform the subcontract, (b)

4

"[t]he baseline [HeS (Build 252)] source code. . . transferred to ASM . . .  [for ROVR] was not to be used for any other purpose," and (c) "HeS will continue to have sole ownership (IP) to the . . . baseline software since the changes made to the . . .  code are part of the commercial HeS product." *Id.* at 578–80 (Ex. 59).  On January 14, 2013, ASM and the Government executed Modification No. 15 of their contract under which ASM and Plaintiff undertook their work on the ROVR software.  *See* DMSJK Ex. 15, ECF No. 145-19.  The modification provided that, "The contractor grants full Government Purpose Rights (GPR) to the Government.  No license fee will be required." *Id.* at 12.

On December 19, 2013, Plaintiff and ASM signed Modification No. 01 of their subcontract, extending the period of performance from September 20, 2013, to May 7, 2014, and amending the Transfer of Restricted Source Code and Works for Hire sections, among other things.  ECF No. 148-4 at 658–59 (Ex. 63).  Specifically, the amendment again provided that Plaintiff "will continue to have sole ownership (IP) to the HeS baseline software since the changes being made are part of the commercial HeS baseline product." *Id.* at 659.  On May 7, 2014, the subcontract's period of performance expired. *Id.* at 658.

On May 27, 2014, ASM delivered the source code for ROVR version 5.2, iteration 15 ("Build 311") via DVD to Mr. Mike Tackett, a project manager for VSSM, with Government Purpose Rights ("GPR"). *Id.* at 694 (Ex. 67), 827 (Ex. 76).  According to Plaintiff, Build 311 wholly incorporates HeS's baseline code (Build 252).  ECF No. 145-7 at 8.  Mr. Robert Kosman, a development manager for ASM, testified that Plaintiff's commercial End-User License Agreement ("EULA") for ROVR was contained in the code delivered to the Government but was specifically configured not to display to users.  Decl. of Robert C. Kosman ¶ 6, ECF No. 145-1; ECF No. 148-4 at 557–58 (Ex. 57; Kosman Tr. 60:6-61:13); ECF No. 145-6 at 26 (Kosman Tr.

114:16–18) (explaining that the EULA is not shown to users for the ROVR application because the Government required a common access card login process); DMSJK Ex. 10 at 2–4, ECF No. 145-14 (August 2012 Ticket #14693 to modify ROVR code to not show EULA at new user login). Mr. Kosman further clarified that the text of the non-displayed EULA was a remnant of a different login process from prior versions of HeS predating the 2012–2014 development of ROVR, and it included a copyright notice dated 2007.  ECF No. 145-1 ¶ 8; *see* DMSJK Ex. 8 at 9, 15, ECF No. 145-12; PMSJK Ex. 133 at 540, ECF No. 148-5.  Ms. Laura Swindells, Plaintiff's former lead engineer, testified that the ROVR software was installed on Pentagon servers in 2013 and that she did not remember whether the EULA was displayed or not.  ECF No. 148-5 at 453–55 (Ex. 130; Swindells Tr. 87:8–88:21, 137:11–20).

On May 29, 2014, two days after ASM delivered the ROVR source code, the Government issued a Justification and Approval ("J&A") for a sole-source contract to ASM for "continued maintenance and technical support" of ROVR.  ECF No. 148-4 at 697 (Ex. 68).  The J&A stated that "ASM has proprietary rights to [ROVR's] basic software source code" and that "[n]o other vendor can perform these tasks as they do not have access to the proprietary code."  *Id.* at 698. The J&A further stated that "[i]t is estimated that it would cost a minimum of [$5.3] million to replace the basic electronic animal record[.]"  *Id.*  Subsequently, ASM and Plaintiff exchanged several emails regarding whether the Government properly held GPR.  *Id.* at 681–87 (Ex. 66).  In the emails, ASM asserted that the Government paid for the software and thus held GPR, while Plaintiff maintained that it did not grant GPR to the Government.  *Id.* at 681–82, 687.  On September 30, 2014, the Government awarded the sole-source contract, HT-0015-14-D-0001, to ASM.  *Id.* at 704 (Ex. 69).  On October 1 and November 3, 2014, Plaintiff informed the Government that it was the sole owner of the ROVR software and source code.  *Id.* at 637 (Ex. 61)

6

(letter to the U.S. Department of the Army), 790 (Ex. 70) (letter to Acting Director of Procurement at the U.S. Army Contracting Office).

Given the conflicting representations about proprietary rights and her concern that ASM was not authorized to use the ROVR source code (and thus neither was the Government), DHA's then-Contracting Officer ("CO"), Jennifer Graham, issued a letter to ASM and Plaintiff on January 28, 2015, requesting clarification and supporting documentation regarding the ownership of the code and justification for why the Government should or should not proceed with GPR in the ROVR source code.  *Id.* at 793–95 (Ex. 71).  Plaintiff responded to the Government's letter on February 9, 2015, and ASM responded on February 17, 2015.  *Id.* at 642–52 (Ex. 62), 800–05 (Ex. 72).  In addition to providing answers to the CO's requests for information, Plaintiff's letter included two requests of the CO: (1) that she terminate ASM's sole-source contract and award it to Plaintiff, and (2) that the Government "compensate [Plaintiff] for the use of its code from 7 May 2014 forward."  *Id.* at 652 (Ex. 62).

Over two years later, on December 11, 2017, Plaintiff sent a second letter to the CO requesting a final decision on its demand for compensation as set forth in its February 2015 letter. Pl.'s Am. Compl. Encl. 11 at 3, ECF No. 6-11 (citing 28 U.S.C. § 1498(b)).  Plaintiff followed up with a letter to the CO on March 5, 2018, which included a certification by Plaintiff's CEO, Mr. Barry Greene.  ECF No. 148-4 at 808–09 (Ex. 73).  The Government has never responded to these letters, and the CO indicated she did not remember seeing the February 2015 letter and did not know why a response to the letter was not sent.  ECF No. 148-5 at 546–47 (Ex. 134; Graham Tr. 36:8–37:16).

In addition to Build 311, ASM also delivered the uncompiled ROVR code ("Build 340") to DHA in September 2019, per the Government's request.  ECF No. 148-4 at 815 (Ex. 75), 828

(Ex. 76); ECF No. 148-5 at 3 (Ex. 77).  Due to the instant case, ASM initially advised the CO that it was unable to deliver the code because ROVR was subject to pending litigation, and it was unclear whether the Government had rights to delivery of the uncompiled code.  ECF No. 148-4 at 663 (Ex. 64) (explaining "the Government did not contract for the uncompiled code, rights to the delivery of uncompiled code are not contemplated by the DFARS, and . . . HealtheState retains ownership in the code base").  ASM ultimately relented after DHA issued a 10-day cure notice advising that it would potentially terminate the contract, HT-0015-14-D-0001, if ASM failed to deliver the uncompiled source code.  *Id.* at 812 (Ex. 74); ECF No. 148-5 at 3 (Ex. 77).

## B.  Procedural History

On January 5, 2018, Plaintiff filed its Complaint alleging one count of copyright infringement.  Pl.'s Compl., ECF No. 1.  The Government moved to dismiss, arguing that the Complaint failed to state a claim upon which relief could be granted because it did not establish that Plaintiff complied with 17 U.S.C. § 411(a)'s copyright registration requirement, which is a precondition to filing a claim of copyright infringement.  Gov't.'s Mot. to Dismiss at 7, ECF No. 5.  As a result, Plaintiff applied for and received two copyright registrations: TX0008498425 ("'425) for HeS and TX0008498391 ("'391") for ROVR.  Resp. of the Reg. of Copyrights at 2–3, ECF No. 187.  On March 16, 2018, Plaintiff filed an Amended Complaint, and the Court consequently denied the Government's motion to dismiss as moot.  *See* First Am. Compl., ECF No. 6; Order & Op. at 2, ECF No. 20.  In its Amended Complaint, Plaintiff reasserted its copyright infringement claim and raised an additional cause of action under the Contract Disputes Act ("CDA") for breach of an express or implied-in-fact contract.  ECF No. 6 ¶¶ 19–33.  The Government filed a second motion to dismiss for failure to state a breach of contract claim, which

the Court denied on June 17, 2019.  Order & Op. at 4–8, ECF No. 27 (holding that Plaintiff had pled sufficient facts to survive dismissal at the pleadings stage).

Shortly after the Court's ruling on the Government's second motion to dismiss, the Court granted the Government's unopposed motion to issue a notice to ASM as an interested party pursuant to Rule 14(b) of the Rules of the United States Court of Federal Claims ("RCFC").  Order at 1–2, ECF No. 30.  ASM appeared on October 9, 2019, and filed a motion to dismiss for lack of subject-matter jurisdiction, arguing that 28 U.S.C. § 1500 barred Plaintiff's action in this Court because Plaintiff had a suit pending against ASM (and its successor in interest) in Virginia state court.  ASM's Mot. to Dismiss at 7–8, ECF No. 37.  The Court denied ASM's motion, and the United States Court of Appeals for the Federal Circuit denied ASM's request for permission to file an interlocutory appeal.  Mem. Op. & Order at 8, 10, ECF No. 51 (denying motion); Op. & Order at 6, ECF No. 70 (denying reconsideration and certifying dismissal order for interlocutory appeal); *HealtheState v. United States*, 825 F. App'x 919, 920 (Fed. Cir. 2020).

Following the close of fact and expert discovery in December 2021, the parties cross-moved for summary judgment on Plaintiff's breach of contract claim.  *See* DMSJK at 9, ECF No. 145; ECF No. 148 at 7.  These motions became fully briefed on March 1, 2022.  *See* Reply in Supp. of DMSJK, ECF No. 155; Reply in Supp. of PMSJK, ECF No. 160.

The copyright claim proceeded on a separate track.  On January 7, 2022, Defendants filed a motion to refer certain questions to the Register of Copyrights ("Register") pursuant to 17 U.S.C. § 1411(b)(2).  Mot. to Refer Questions to the Reg. of Copyrights, ECF No. 146.  Defendants alleged that Plaintiff included, among other information, inaccurate deposit copies with its applications for copyright registration with knowledge of the inaccuracy, and Defendants sought an order directing the Register to advise whether her office would have refused the registrations

had it known of the inaccuracy.[1]  *See id.* at 3–4.  On April 15, 2022, the Court granted Defendants'

motion over Plaintiff's objections.  *See* Op. & Order, ECF No. 165; Referral of Copyright

Registration Questions to Reg. of Copyrights, ECF No. 176.  The Register provided a response on

June 28, 2022, informing the Court that if, as alleged, the deposit copies provided with Plaintiff's

applications were not the versions of the software first published on the dates indicated on their

respective applications, and instead included material added and/or altered after those publication

dates, the United States Copyright Office ("USCO") would not have registered the claims."  ECF

No. 187 at 15, 16.

On April 12, 2022, Plaintiff moved for summary judgment on its copyright infringement

claim.  Pl.'s Mot. for Summ. J. on Copyright Claim ("PMSJC"), ECF No. 164.  Defendants filed

their opposition on May 17, 2022.  Defs.' Opp'n to PMSJC, ECF No. 181.  On June 3, 2022, the

USCO received Plaintiff's applications for supplementary registration to modify the year of

completion and date of publication of the two copyright registrations and to identify material

excluded from the claims.  ECF No. 187 at 3.  The USCO stayed its consideration of Plaintiff's

supplementary registration applications due to the current litigation.  *Id.* at 4.  On September 6,

2022, following the receipt of the Register's response to the Court's referral order, Defendants

cross-moved for summary judgment on the copyright infringement claim limited to the question

of whether Plaintiff's copyright registrations are valid.  Defs.' Mot. for Summ. J. on Copyright

Claim ("DMSJC") at 6, ECF No. 195.  Plaintiff filed its opposition on September 20, 2022.  Pl.'s

Opp'n to DMSJC, ECF No. 196.  The cross-motions became fully briefed on June 7, 2022, and

---

[1]  The other alleged inaccuracies pertained to the dates of first publication, years of
completion, and disclosure of preexisting works related to the '425 and '391 applications.

September 27, 2022, respectively.  *See* Pl.'s Reply in Supp. of PMSJC, ECF No. 182; Defs.' Reply

in Supp. of DMSJC, ECF No. 197.

Separately, the parties filed numerous motions to exclude expert testimony, including, as

relevant to this opinion, Defendants' *Daubert* Motion to Exclude Dr. Johnette Hassell's expert

opinions.[2]  Defs.' *Daubert* Mot. at 8, ECF No. 166.  Defendants ask the Court to exclude and/or

strike Dr. Hassell's expert reports because they offer unreliable opinions that will not assist the

Court in understanding the alleged infringement claim, and because the second report and

declaration are procedurally improper.  *Id.* at 9–10.  In response, Plaintiff argues that Dr. Hassell

performed the appropriate analysis needed to determine infringement, including reviewing and

comparing the relevant source code, and that the reports were all procedurally compliant.  *See* Pl.'s

Resp. to Defs.' *Daubert* Mot. at 5–6, 13–14, ECF No. 172.  Briefing concluded on May 10, 2022.

*See* Defs.' Reply in Supp. of *Daubert* Mot., ECF No. 178.

All the pending motions are now fully briefed and ripe for decision.  On February 15, 2023,

the Court held oral argument.  On August 25, 2023, the Court ordered the parties to submit

supplemental briefing related to the parties' positions on Plaintiff's breach of contract claim,

considering the Federal Circuit's recent decision in *ECC International Constructors, LLC v.

Secretary of the Army*, 79 F.4th 1364 (Fed. Cir. 2023) ("*ECC*").  *See* Order, ECF No. 206.  Relevant

to Plaintiff's copyright infringement claim, the Court also requested supplemental briefing on

cases post-dating the close of briefing that have applied the Supreme Court's decision in *Unicolors,

Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178 (2022).  *Id.*  Supplemental briefing is likewise

---

[2] The Court's rulings on the summary judgment motions render moot the parties' other
motions to strike and/or exclude.  *See* Defs.' Mot. to Strike/Exclude Barry Greene, ECF No. 161;
Pl.'s Mot. in Limine to Exclude William Elkington, Dr. Martin Walker, and Cheryl LeeVan, ECF
No. 168; Defs.' Mot. to Strike/Exclude Michael Kreitzer, ECF No. 169.

complete.  *See* Pl.'s Suppl. Br., ECF No. 207; Defs.' Suppl. Br., ECF No. 208; Defs.' Resp. to

Pl.'s Suppl. Br., ECF No. 209; Pl.'s Resp. to Defs.' Suppl. Br., ECF No. 210.

## II.  LEGAL STANDARDS

### A.    Motion for Summary Judgment

Summary judgment is warranted when "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A

fact is material when it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  A dispute is genuine, thus necessitating a trial, when a finder of fact

may resolve factual issues in favor of either party.  *Id.* at 250.  "When deciding a summary

judgment motion, all of the nonmovant's evidence is to be credited, and all justifiable inferences

are drawn in the nonmovant's favor."  *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 671 (Fed. Cir. 2000)

(citing *Anderson*, 477 U.S. at 255); *see Dairyland Power Coop. v. United States*, 16 F.3d 1197,

1202 (Fed. Cir. 1994).  Where "the evidence is such that a reasonable jury could return a verdict

for the nonmoving party," summary judgment is not appropriate.  *Anderson*, 477 U.S. at 248.

"With respect to cross-motions for summary judgment, each motion is evaluated on its own merits

and reasonable inferences are resolved against the party whose motion is being considered."

*Marriott Int'l Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (Fed. Cir. 2009) (citing *Mingus

Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

The moving party bears the burden of proving the absence of a genuine dispute of material

fact but "may discharge its burden by showing the court that there is an absence of evidence to

support the nonmoving party's case."  *Dairyland Power*, 16 F.3d at 1202 (citing *Celotex Corp. v.

Catrett*, 477 U.S. 317, 325 (1986)).  If the moving party meets its initial burden, the nonmoving

party must then set out specific facts showing a genuine issue for trial to defeat the motion.  *See*

*Anderson*, 477 U.S. at 250.  The nonmoving party may not simply rely on the pleadings and must

do more than make "conclusory allegations [in] an affidavit."  *Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 888 (1990).  Summary judgment must be granted for the moving party if the nonmoving

party "fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at

322–23.  In such a case, "there can be 'no genuine issue as to any material fact,' since a complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders

all other facts immaterial."  *Id.*

**B.**     **Admissibility of Expert Testimony**

The Federal Rules of Evidence ("FRE") govern admissibility of evidence in this Court.  28

U.S.C. § 2503(b).  When evaluating the admissibility of an expert witness's testimony, FRE 702

is controlling and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

FRE 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court set forth the

standards governing admissibility of expert testimony.  509 U.S. 579, 589–95 (1993).  As

explained by the Federal Circuit, the framework articulated in *Daubert* permits a court to consider

several factors, including: "(1) whether the methodology is scientific knowledge that will assist

the trier of fact; (2) whether the methodology has been tested; (3) whether the methodology has

been published in peer-reviewed journals; (4) whether there is a known, potential rate of error; and

(5) whether the methodology is generally accepted."  *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,

802 F.3d 1283, 1295 (Fed. Cir. 2015) (citing *Daubert*, 509 U.S. at 591–95).  A court may exclude evidence "that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case."  *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Pursuant to FRE 104(a), a trial judge must determine "at the outset" whether an expert witness is qualified or whether his or her opinions "will assist the trier of fact to understand or determine a fact in issue."  *Daubert*, 509 U.S. at 592.  In ruling on the admissibility of expert testimony, a court's inquiry must ensure both that the data used by the expert is "sufficiently tied to the facts of the case," and that the expert's methodology is not "plagued by logical deficiencies or . . . otherwise unreasonable."  *Summit 6*, 802 F.3d at 1296 (citations omitted).  The Court's preliminary inquiry is satisfied once it reaches this conclusion.  *See Daubert*, 509 U.S. at 592– 93.  Whether the expert's testimony is credible is determined after the evidence is tested at trial.  *See id.* at 596.

## III.  DISCUSSION

### A.    Defendants are Entitled to Summary Judgment Because Plaintiff Has Not Established the Sum Certain Element of Its Breach of Contract Claim.

Defendants initially argued that Plaintiff had not established jurisdiction over its breach of contract claim because it did not submit a proper claim to the CO containing a sum certain demand for payment.  *See* ECF No. 145 at 38.  However, following the completion of briefing and oral argument, the Federal Circuit held that a sum certain is not a jurisdictional prerequisite; rather, it is "an element of a CDA claim that a claimant must satisfy in order to recover."  *ECC*, 49 F.4th at 1376.  Since a sum certain is a non-jurisdictional requirement, the Court further held that a

challenging party could forfeit an objection to a deficient sum certain if it waited too long to raise the issue. *Id.* at 1380.

In their supplemental brief, Defendants argue that under *ECC* summary judgment remains appropriate because Plaintiff has not satisfied the still-mandatory sum certain requirement. ECF No. 208 at 3. Plaintiff continues to disagree, and additionally argues that Defendants have waived or forfeited their sum certain objection given the number of years that have elapsed since Plaintiff submitted the claim. ECF No. 207 at 2–4. Otherwise, the parties' supplemental briefs largely reiterate their arguments about whether the letters comprising Plaintiff's claim state a sum certain as a matter of law. *See id.* at 2–3; ECF No. 208 at 3–6. The Court agrees with Defendants. Plaintiff did not properly submit to the CO a claim containing a sum certain, and thus it has failed to establish an essential element of its CDA claim. Additionally, unlike in *ECC*, Defendants have not waived or forfeited their challenge to the lack of a sum certain given the litigation history in this case.[3]

---

[3] Defendants' supplemental brief also elaborates on a different jurisdictional argument briefly raised in a footnote of their summary judgment motion. Specifically, Defendants argue that Plaintiff's February 2015 letter did not constitute a claim under the CDA because it was submitted for an "independent, data rights validation purpose" in response to the Army's request. ECF No. 208 at 6; *see* ECF No. 145 at 41 n.12. Although neither party addresses the issue, the Court questions whether this argument—which, like a sum certain, goes more to the procedural requirements of a CDA claim—is jurisdictional in nature given the reasoning set forth in *ECC*. As the Federal Circuit explained, the CDA does not define what constitutes a "claim," other than that it must be in writing. *ECC*, 79 F.4th at 1372–73. As discussed further below, Plaintiff produced a series of letters sent to the CO that comprise its CDA claim. Whether Plaintiff was required to submit a standalone demand unrelated to any other purpose strikes the Court as the type of claim-processing rule that the Federal Circuit determined does not implicate jurisdiction. Defendants further argue that Plaintiff's breach of contract claim was not presented to the CO because none of the letters that comprise Plaintiff's claim referred to such a theory or referred to the EULA that forms the basis of the claim asserted in this action. ECF No. 208 at 6–7 ("An action brought before the Court of Federal Claims under the CDA must be based on the same claim previously presented to and denied by the contracting officer." (quoting *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003)). It is true that the February 2015 letter did not identify any particular

The Tucker Act provides that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under [the CDA] including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act."  28 U.S.C. § 1491(a)(2); *see* 41 U.S.C. § 7104(b)(1).  Since the CDA does not define "claim," the Court looks to the Federal Acquisition Regulation ("FAR"), which defines the term as a "written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a *sum certain*, the adjustment or interpretation of contract terms, or other relief arising from or relating to th[e] contract."  48 C.F.R. § 2.101 (2023) (emphasis added); *id.* § 52.233-1(c). While there is no requirement that a claim "be submitted in any particular form or use any particular wording," it must provide "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim."  *Cont. Cleaning Maint. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987).  Such requirement is met "if the contracting officer can determine the amount by a simple mathematical calculation."  *Modeer v. United States*, 68 Fed. Cl. 131, 137 (2005), *aff'd*, 183 F. App'x 975, 977 (Fed. Cir. 2006).  A claim must also include a request for a final decision and, if the claim exceeds $100,000, a certification executed by an

---

legal theory, but it repeatedly alleged that Plaintiff agreed to grant ASM a limited license to use the baseline HeS source code during the performance of their ROVR subcontract, asserted restricted rights in certain portions of the HeS software in a 2010 letter to the Army, and sought compensation for the Government's alleged unauthorized use of the code. *See, e.g.*, ECF No. 148-4 at 643–45 (Ex. 62).  These are the same operative facts and request for relief underlying the breach of contract claim alleged in the Amended Complaint. *Compare id. with* ECF No. 6 ¶¶ 4–7, 21, 24, 26.  Although the February 2015 letter did not mention the EULA specifically, Plaintiff's allegations regarding the EULA are at most an amplification of its legal theory, not a separate and distinct claim. *See Scott Timber*, 333 F.3d at 1365–66.  Thus, the Court has jurisdiction over Plaintiff's breach of contract claim.

authorized individual on behalf of the contractor.  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 1987); 41 U.S.C. § 7103(b).

Although *ECC* held that the sum certain requirement is non-jurisdictional, the decision confirmed that a sum certain is nonetheless a mandatory element of a CDA claim, and it did not purport to alter the case law guiding the Court's evaluation of whether the sum certain requirement has been met.  Indeed, *ECC* acknowledged that "in the vast majority of cases the distinction between whether the sum-certain requirement is jurisdictional or nonjurisdictional will be of little consequence because the FAR mandates a sum certain for claims seeking monetary relief."  *ECC*, 79 F.4th at 1379.  Such is the case in this matter, and thus the parties' arguments in their initial summary judgment briefing are as pertinent now as before the *ECC* decision.

Here, Plaintiff's written claim can be found in three letters it sent to the CO: (1) the letter dated February 9, 2015, in response to the CO's request for clarification regarding the ownership of the ROVR source code; (2) a letter dated December 11, 2017, requesting a final decision on Plaintiff's claim as set forth in the February 2015 letter; and (3) a letter dated March 5, 2018, again requesting a final decision and including a certification by Mr. Greene.  ECF No. 148 at 53 (citing ECF No. 6-11 at 3; ECF No. 148-4 at 642–52 (Ex. 62), 808–09 (Ex. 73)); *see* ECF No. 145 at 40–41.  Although several pieces of correspondence can collectively comprise a claim, none of Plaintiff's letters to the CO (separately or taken together) provided a clear and unequivocal statement of the amount of its claim.  *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 184 (2007).  The February 2015 letter merely requested in general terms that the Government "compensate HeS for the use of its code from 7 May 2014 forward."  ECF No. 148-4 at 652 (Ex. 62).  Plaintiff's follow-up letters only repeated that unspecific request.  ECF No. 6-11 at 3; ECF No. 148-4 at 808 (Ex. 73).

Plaintiff argues that the sum certain amount of its claim can be determined by a simple mathematical calculation.  ECF No. 148 at 55–56.  Since the start of this litigation, however, Plaintiff has presented at least three separate ways to calculate its sum certain, each totaling a different amount.  First, Mr. Greene, Plaintiff's CEO and designated Rule 30(b)(6) witness, testified at deposition that Plaintiff's claim was valued at $500,000 per engagement based on attachments to the February 2015 letter that outlined prior licenses and the amounts paid in contracts between ASM and Plaintiff.[4]  *See* DMSJK Ex. 6 at 26 (Greene Tr. 134:4–10) (explaining that the amount "was presented in our February [20]15 claim in the nature of the documents for the preceding licenses we had provided"), 32 (Greene Tr. 141:1–14) (explaining that the certified claim amount was in an attachment to the February 2015 letter, "specifically the contracts . . . between ASM[] and HEALTHeSTATE that showed very, very clearly what the amounts were that were being paid"), 32–33 (Greene Tr. 141:22–142:6) ("It would have been at least $500,000 per pop[5] on contract plus exclusive development."), ECF No. 145-10.  When further pressed during the deposition about which specific attachment stated the amount of the claim, Mr. Greene pointed to ASM's subcontract with Plaintiff and Modification No. 01, stating that both reference the "source code access fee for a period of performance and . . . HEALTHeSTATE's subcontracting for development work, which are requirements for every contract."  *Id.* at 45 (Greene Tr. 154:10–19).  Since no explicit source code access fee was listed in either document, Mr. Greene indicated that the sum certain "can be derived by adding up the payments" listed in another exhibit attached

---

[4] Mr. Greene initially testified that Plaintiff did not submit a sum certain in its claim letters.  DMSJK Ex. 6 at 15 (Greene Tr. 118:3–8) (responding, "Not that I'm aware" when asked whether Plaintiff provided in any correspondence to the Government a sum certain for the amount it was claiming), 16 (Greene Tr. 119:7–11), ECF No. 145-10.  Following the lunch break, and review of the February 2015 letter, Mr. Greene corrected his testimony.

[5] Per engagement.  Oral Arg. Hr'g Tr. at 52:1–12, ECF No. 203.

to the letter, *id.* at 50 (Greene Tr. 160:16–17), which "came to between $5[00,000] and $550,000," *id.* at 51 (Greene Tr. 161:11–12).

In its summary judgment briefing, Plaintiff raised a second theory of its sum certain amount, pointing to its "entitlement to a range of a minimum of 25% to a maximum of 50% for new ROVR work" per Modification No. 01, which was attached to the February 2015 letter. ECF No. 148 at 56. Plaintiff claimed the Government needed only to perform a simple calculation— what 25% and 50% of the contract awarded to ASM equals—to determine "the range of money to which [it] is entitled to [as] compensation for use of its software." *Id.* Assuming that formula used the base period contract price of $2,061,500, the range would equal $515,375 to $1,030,750. *See* ECF No. 148-4 at 697 (Ex. 68). Plaintiff highlights this theory again in its opening supplemental brief. ECF No. 207 at 2 (arguing the simple mathematical calculation is "25-50% of the value of any contract let to ASMR in violation of the restricted license asserted by [Plaintiff]").

At oral argument, Plaintiff raised yet a third argument, claiming its sum certain was 25% (the minimum end of the range) of whatever the Government had awarded to ASM because "the minimum is a sum certain." Oral Arg. Hr'g Tr. at 40:18–19, ECF No. 203; *see id.* at 41:5–7. As Plaintiff further explained: "It's just like a requirements contract. It's the guaranteed amount. So that's the certain sum," and "if you can reduce the amount to a formula, then it is a sum certain." *Id.* at 40:23–41:2. Under that theory, the sum certain would equal $515,375, again assuming Plaintiff is using the base period contract price. Plaintiff may refer to this third theory in its responsive supplemental brief; however, it now adds to the calculation a $372,500 annual maintenance fee. *See* ECF No. 210 at 2 (arguing the calculation is "at least twenty-five percent (25%) times the value of the millions of dollars awarded [to ASM] requiring use of the HeS Baseline Code, plus the [] annual maintenance fee").

Considering the evolving theories presented by Plaintiff during the course of this litigation and, in particular, that even Plaintiff cannot seem to identify a definitive sum certain, it stands to reason that no sum certain was clearly and unequivocally submitted to the CO.  Nor could the CO be expected to determine a sum certain through a simple mathematical calculation where Plaintiff's letters never clearly identified the information or supporting documents on which any mathematical formula should be based.  *See Newtech Rsch. Sys. LLC v. United States*, 99 Fed. Cl. 193, 204–05 (2011) (finding that a claim stated a sum certain where claimant attached documents used to calculate a specific amount of costs allegedly incurred).  Notably, the February 2015 letter referenced 19 documents attached as exhibits.  *See* ECF No. 148-4 at 642–52 (Ex. 62).  If the calculation of Plaintiff's sum-certain demand for payment was based on information contained in the supporting documents, and it was according to Plaintiff's theories, it was incumbent on Plaintiff to identify that information to the CO.  *See N. Star Alaska Hous.*, 76 Fed. Cl. at 185–86 & n.31 (holding that a sum certain could not "be cobbled together from various documents that were possessed by the defendant"); *Metric Constr. Co., Inc. v. United States*, 14 Cl. Ct. 177, 180 (1988) (holding that it would not be a matter of simple arithmetic to determine the sum certain amounts of plaintiff's claim by reference to voluminous exhibits attached to its written demand); *Tambolina Servs., Inc. v. United States*, No. 14-478 C, 2015 WL 4053490, at *4 (Fed. Cl. July 2, 2015) (holding that claim letter did not provide a damages framework from which the contracting officer could determine a sum certain, even if documents in his possession may have pointed to certain parameters for a claim).  Plaintiff could have easily done so.

Even assuming some version of Plaintiff's theories asserting different ranges of amounts were properly presented to the CO, the claim still would not have a "sum certain" because the CO would have been unable to determine *which amount* Plaintiff was demanding.  *See Metric Constr.*,

14 Cl. Ct. at 177 (holding that no sum certain is stated where "no specific amount or an open-ended amount is sought").   In this regard, an amount stated as a range does not "provide enough specificity so as to meet the twin purposes of the CDA's administrative exhaustion requirement—to screen out unwarranted or inflated claims, and to facilitate the resolution of contract disputes by negotiation, at the agency level, rather than by litigation[.]"   *N. Star Alaska Hous.*, 76 Fed. Cl. at 186 (citations omitted).   Without a sum certain, a contracting officer cannot settle the claim with finality by awarding the contractor anything less than the maximum amount sought because, even if a partial settlement amount was provided, it would not "preclude the contractor from filing suit seeking the difference between the amount awarded and some larger amount" in the range.   *See id.* (quoting *Exec. Ct. Reps., Inc. v. United States*, 29 Fed. Cl. 769, 775 (1993)).

In sum, Plaintiff was required to submit in writing "a clear and unequivocal statement" providing the CO "adequate notice of the . . . amount of the claim."   *Cont. Cleaning Maint.*, 811 F.2d at 592.   It did not do so.   Accordingly, Plaintiff has failed to establish an essential element of its breach of contract claim.[6]

Moreover, this is not a case where application of the waiver or forfeiture doctrine to Defendants' sum certain objection is appropriate.   Plaintiff emphasizes that the CO did not object to the lack of a sum certain at the time Plaintiff submitted its claim and waited until after suit was filed in 2018 to assert an objection.   ECF No. 210 at 3.   But the CO here did not respond to

---

[6] Contrary to its argument, Plaintiff cannot simply cure this deficiency before trial.   ECF No. 148 at 56.   Since the case is already in litigation, as a matter of law the CO cannot now consider or rule on a revised claim that meets the sum certain requirement since he or she is divested of the authority to issue a final decision.   *Securiforce Int'l Am., LLC v. United States*, 879 F.3d 1354, 1360 (Fed. Cir. 2018) ("[O]nce a claim is in litigation, the contracting officer may not rule on it—even if the claim . . . was not properly submitted to and denied by the contracting officer before it was placed in litigation." (quoting *K–Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015))).

Plaintiff's claim at all, entitling Plaintiff to bring a challenge premised on a deemed denial.  *See* 41 U.S.C. § 7103(f)(5).  The decision to bring such a challenge and the timing of Plaintiff's suit were factors squarely within Plaintiff's control.  There is no indication in either the *ECC* decision or the statutory language of the CDA that a deemed denial should result in the Government's forfeiture or waiver of an objection to a lack of sum certain, let alone any other objections or defenses to a claim.

Plaintiff also highlights that Defendants first raised their sum certain objection several years into this litigation after two rounds of dismissal motions, a request for interlocutory appeal, and years of discovery.  ECF No. 210 at 3.  There is some facial appeal to this argument, but only if one focuses solely on the duration of time, as opposed to this case's procedural history.  As Defendants' correctly note, each of their Answers to the Amended Complaint both denied that Plaintiff's letters constituted a valid CDA claim and asserted as an affirmative defense that Plaintiff had failed to comply with the CDA's presentment requirements.  *See* Gov't.'s Answer ¶ 20 (denying that Plaintiff submitted a proper claim to the Government for breach of contract and met all prerequisites to filing suit), Affirmative Def. ¶ 9 (alleging that Plaintiff "failed to adequately pursue an adequate administrative remedy" and/or comply with the requirements of 41 U.S.C. § 7103), ECF No. 29; *see also* ASM's Answer ¶ 20, Affirmative Def. ¶ 11, ECF No. 52.  As discussed above, Defendants later sought discovery relevant to the sum certain question, *see, e.g.*, ECF No. 145-10 at 15–16, 44–54 (Greene Tr. 118:3–119:10, 153:12–164:8), and timely asserted their sum certain objection at the summary judgment stage.  The only earlier opportunity Defendants arguably had to raise the objection was through a Rule 12 motion; however, RCFC 12 does not require parties to raise a failure-to-state-a-claim argument by motion and does not provide for waiver of such argument for a movant's failure to do so.  *See* RCFC 12(h)(1) (providing for

waiver of defenses stated in RCFC 12(b)(2)–(5), but not RCFC 12(b)(6)), 12(h)(2) (permitting

parties to raise defenses stated in RCFC 12(b)(6)–(7) in a responsive pleading, Rule 12(c) motion,

or at trial).

This procedural posture is a far cry from the circumstances presented in *ECC*, where the

Government raised a sum certain argument for the first time after the contractor and the

Government had engaged in six years of settlement negotiations to resolve the contractor's case

before the Armed Services Board of Contract Appeals, discovery, a second attempt to resolve the

case through alternative dispute resolution with a Board judge, summary judgment briefing, an

appeal from the summary judgment order, and a nine-day hearing on the merits before the Board.

*See ECC*, 79 F.4th at 1380.  Although the Federal Circuit did not determine how long is too long

for the Government to raise a sum certain objection and instead remanded the case to the Board to

consider the issue, the cases the Court cited in discussing forfeiture likewise are distinguishable

from this case.  *See id.* at 1379–80 (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 504, 508 (2006)

(involving a challenge to subject-matter jurisdiction after a jury trial and the trial court's entry of

judgment); *Kontrick v. Ryan*, 540 U.S. 443, 459 (2004) (concerning a bankruptcy rule invoked

after the court decided the merits of the issue and where the objecting party failed to raise the issue

in either its responsive pleading or at the summary judgment stage)).

**B.  In the Alternative, Plaintiff Has Not Established the Elements of a Contract with the Government Under Any Contract Formation Theory, As It Cannot Demonstrate a Government Agent with Actual Authority Agreed to Any Such Contract.**

Plaintiff raises several theories of contract formation to support its breach of contract claim:

(1) an express contract, (2) an implied-in-fact contract, and (3) a contract by ratification.[7]

---

[7] Plaintiff's cross-motion for summary judgment on the breach of contract claim appeared to present another theory of contract formation, *i.e.*, one by "operation of law" based on an implied

Defendants argue that Plaintiff has not presented evidence establishing the formation of a valid contract with the Government.  ECF No. 155 at 20–21.  The Court agrees.

Formation of a valid contract is the foundation of a breach of contract claim.  *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  "To recover for breach of contract, a plaintiff must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *Id.*  The requirements to establish a contract with the Government, whether express or implied, are identical.  *Lee v. United States*, 142 Fed. Cl. 722, 729 (2019), *aff'd*, 819 F. App'x 908 (Fed. Cir. 2020).  "[A] plaintiff must show: (1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon."  *Id.* (citing *Kam-Almaz v. United States*, 682 F.3d 1364, 1368 (Fed. Cir. 2012)).  "Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitations on their authority."  *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  "In the absence of factual disputes, the question of contract formation is a question of law[.]"  *Id.*

---

or automatic commercial license under certain DFARS provisions.  *See* ECF No. 148 at 21–22, 24–28.  Such an implied-in-law contract claim is not within this Court's jurisdiction.  *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) ("[I]mplied-in-law contracts, which impose duties that are deemed to arise by operation of law[,] . . . are outside the jurisdiction of the Court of Federal Claims."); *see* ECF No. 155 at 29–30 (collecting cases).  Plaintiff, however, clarified in its responsive brief that it is not raising an implied-in-law contract theory.  According to Plaintiff, the DFARS provisions it cites are relevant to the application of the EULA containing HeS's commercial software terms, which supports its express and implied-in-fact contract formation theories.  ECF No. 160 at 8–9.

24

Under a contract ratification theory (whether at the individual or institutional level), the requirement of actual authority to bind the United States remains.  *See Lee*, 142 Fed. Cl. at 729 n. 2.  Individual ratification requires that a supervisor "(1) possesses the actual authority to contract; (2) fully knew the material facts surrounding the unauthorized action of his or her subordinate; and (3) knowingly confirmed, adopted, or acquiesced to the unauthorized action of the subordinate." *Id.* (citing *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 654 (2007)).  On the other hand, "institutional ratification occurs when the government 'seeks and receives benefits from an otherwise unauthorized contract.'" *Id.* (quoting *SGS-92-X003*, 74 Fed. Cl. at 654).  An essential element of institutional ratification is that the official "with ratifying authority[,] must know of the unlawful promise." *Gary v. United States*, 67 Fed. Cl. 202, 216 (2005).  "Silence in and of itself is not sufficient to establish demonstrated acceptance of [a] contract" by the authorized agent.[8] *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998).

Here, Plaintiff argues that the EULA contained in ROVR's source code is an express contract to which the Government agreed to be bound.  ECF No. 148 at 24 & n.11; *see id.* at 21 ("[T]he EULA remains in the source code and sets forth the commercial license terms by which the Government is bound.").  In the alternative, Plaintiff contends that an implied-in-fact contract exists, "binding the Government to the terms of the commercial license incorporated into the [ROVR] software, based on the conduct of the parties and the governing DFARS provisions." *Id.* at 46.  Accordingly, the EULA allegedly forms the terms of the contract underlying Plaintiff's

---

[8] The Court agrees with Defendants that Plaintiff's ratification theory should be rejected because it was not alleged in the Amended Complaint or raised during discovery.  ECF No. 155 at 22; *see On-Line Techs. v. Bodenseewerk Perkin-Elmer*, 386 F.3d 1133, 1146 (Fed. Cir. 2004) (explaining that plaintiffs cannot at summary judgment raise a new basis for liability on a breach of contract claim).  However, since the ratification theory fails for the same reasons that the other theories fail, the Court has incorporated ratification in its analysis below.

breach of contract claim, no matter the theory raised.  ECF No. 160 at 8–9; *see* ECF No. 145-12 at 5, 9, 11.

Under any theory of contract formation, however, Plaintiff fails to meet its burden of demonstrating that it formed a valid contract with the Government.  Significantly, there are several defects affecting contract formation—*e.g.*, no proof of mutuality of intent, no offer and acceptance, and no assent to the terms of the hidden EULA.  But the fatal flaw that destroys each of Plaintiff's contract formation theories is that the evidence does not establish that a government agent with *actual authority* expressly or impliedly agreed to the EULA, or otherwise ratified the EULA or any other implied-in-fact contract.  *See Trauma Serv. Grp.*, 104 F.3d at 1327 (explaining that the plaintiff must allege (and ultimately prove) facts sufficient to show the government representative had implied actual authority to bind the Government); *see also Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007).  Indeed, Plaintiff does not dispute that, although it was present in the ROVR code, the EULA was "hidden" and that the code was specifically modified to *not* display the EULA to users.  ECF No. 148 at 16; *see* ECF No. 148-4 at 557–58 (Ex. 57; Kosman Tr. 60:6–61:13); *see also* ECF No. 145-1 ¶ 6; DMSJK Ex. 2 at 2, ECF No. 145-3; ECF No. 145-6 at 26 (Kosman Tr. 114:16–18); ECF No. 145-14 at 2–5.  And Plaintiff points to no evidence showing that "any particular Government representative" with actual authority to bind the Government saw, let alone assented to, the EULA's terms.  *Trauma Serv. Grp.*, 104 F.3d at 1327.

Plaintiff argues that it has presented sufficient evidence or, at the very least, a genuine dispute of fact exists as to whether the EULA was shown to anyone in the Government, thus warranting denial of Defendants' summary judgment motion.  ECF No. 148 at 20, 37–38, 52.  In support of its contention, Plaintiff emphasizes that Ms. Swindells testified that the ROVR software

was installed in 2013 on a Pentagon server, ECF No. 148-5 at 454 (Ex. 130; Swindells Tr. 88:10–14); that the EULA was "something that was configured on the database end," *id.* at 455 (Swindells Tr. 137:15–16); and that she did not know whether the EULA was shown or not to any user at login, *id.* (Swindells Tr. 137:19–20). Thus, according to Plaintiff, even if the EULA was not shown to field users, "the Government unequivocally accepted it at the time of installation." ECF No. 148 at 20. Plaintiff also emphasizes that a government system administrator had to grant access to field users of ROVR, meaning that the Government generally is the end user of ROVR. *See id.* at 37; *see also* ECF No. 148-3 at 311 (Ex. 31; Hobson Tr. 145:2–10); ECF No. 148-5 at 453–54 (Ex. 130; Swindells Tr. 87:8–88:21). Whether purported acceptance of the EULA occurred at installation or during user-access administration, noticeably absent from these arguments is any evidence showing that the EULA was in fact shown to any government agent. Indeed, Plaintiff's assertion that the Government accepted the EULA's terms by merely installing the software or granting users access is factually speculative at best and not supported by any citation to case law.[9] This does not carry Plaintiff's burden or create a genuine dispute of material fact, especially given the undisputed evidence that the EULA was intentionally hidden from display. *See Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1140 (Fed. Cir. 2021) (explaining that summary judgment cannot be defeated "'with conclusory allegations, unsupported assertions, or

---

[9] Acceptance of an offer to contract is a core requirement of contract formation, and courts have applied that principle equally to software license agreements. *See, e.g.*, *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 829 (N.D. Cal. 2019) ("[T]he consumer must agree to the software license [or EULA] in order to be bound by it . . . [and] silence does not constitute acceptance 'when the offeree reasonably did not know that an offer had been made.'" (quoting *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1285 (9th Cir. 2017))). Even the terms of Plaintiff's EULA expressly required that the user "READ THIS AGREEMENT CAREFULLY" and accept it "BY CLICKING THE 'I ACCEPT THIS AGREEMENT' BUTTON." ECF No. 145-12 at 6 (Ex. 8); *see* ECF No. 148-5 at 534 (Ex. 133).

only a scintilla of evidence.'" (quoting *Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020))); *see also SMS Data Prod. Grp., Inc. v. United States*, 19 Cl. Ct. 612, 617 (1990).

Nevertheless, even assuming a back-end government administrator of ROVR agreed to the EULA at installation or when granting access to field users, Plaintiff still bears the burden of showing that such agent had "actual authority to bind the government in contract." *Lee*, 142 Fed. Cl. at 729; *see United States v. Amdahl Corp.*, 786 F.2d 387, 392 (Fed. Cir. 1986) ("The government has the power to act only through its agents whose authority and manner of exercise thereof is rigidly prescribed and limited by statute, regulation, and judicial and administrative determinations." (citation omitted)). Plaintiff has failed to meet this burden. It argues that various COs and government program managers had the authority to negotiate software license rights for the Government. ECF No. 148 at 29. However, it cites no factual evidence demonstrating that any of these authorized government agents were involved in the software's installation or in granting user access, or that they separately knew about the EULA and agreed to it—whether expressly, impliedly, or by ratifying a subordinate's unauthorized act. Under any theory, Plaintiff has presented no evidence of acceptance of the EULA by a government agent with proper authority.

To the extent Plaintiff's contract theories are premised on the conduct of various COs or other authorized government agents independent of their actual awareness of or assent to the EULA, its breach of contract claim likewise fails as a matter of law. *See id.* at 28–30, 40–42, 47–50, 51–52. Specifically, Plaintiff asserts the following examples of government authority and actions that it contends support contract formation: (1) the COs had authority to accept a commercial license in the ROVR software and failed to negotiate non-commercial rights with Plaintiff directly, (2) the CO was aware of Plaintiff's position that it owned ROVR's baseline code

when the CO issued a cure notice to ASM for delivery of the uncompiled ROVR code, (3) the contracting officer representatives accepted delivery of the uncompiled code, and (4) the CO awarded ASM a sole-source contract to support DHA's use of ROVR despite being advised by Plaintiff that it was asserting rights in the software and without resolving questions about ownership of the baseline code. *Id.* at 29, 41–42.

These facts, taken as true, do not establish that Plaintiff and the Government had "a meeting of the minds," or "tacit understanding," that the Government's use of ROVR prohibited "deleting, modifying, or copying the EULA and accompanying software." ECF No. 148 at 48. It is undisputed that Plaintiff did not negotiate directly with the Government with respect to software rights. *Id.*; *see* ECF No. 145-10 at 61 (Greene Tr. 314:11–17). Only ASM and the Government were in privity of contract with respect to the ROVR software. DMSJK Ex. 14 at 7–8, 10 (Wheatley Tr. 99:21–100:2, 156:4–6), ECF No. 145-18; DMSJK Ex. 12 at 7 (Tackett Tr. 78:8–11), ECF No. 145-16; ECF No. 145-19; *see Turping v. United States*, 913 F.3d 1060, 1066 (Fed. Cir. 2019) ("In two-tiered contract schemes, the Government's obligations are directed to the contractor, with whom it shares a contract, and not the subcontractor, with whom it shares no direct contractual relationship.").

Instead, Plaintiff relies on the CO's silence, inaction, or non-responsiveness regarding Plaintiff's source code ownership claims, which are insufficient to show a mutual intent to contract between Plaintiff and the Government. *See Martin v. United States*, No. 11-781 T, 2012 WL 3164317, at *5 (Fed. Cl. Aug. 6, 2012) ("Neither silence, lack of response, . . . nor failure to respond to plaintiff's questions either factually or legally support plaintiff's claim of implied contract . . . [and] 'does not qualify as an acceptance by the government of the terms.'" (quoting *Martin v. United States*, 102 Fed. Cl. 779, 785 (2012))), *aff'd*, 522 F. App'x 914 (Fed. Cir. 2013);

*Sheppard v. United States*, No. 11-295 C, 2011 WL 6370078, at *5 (Fed. Cl. Dec. 20, 2011) ("[S]ilence does not, except in unusual circumstances . . . constitute acceptance of an offer to enter into a contract.").

Plaintiff also relies on an argument that, because of such alleged inaction, the DFARS bound the Government to Plaintiff's standard commercial license "by operation of law." ECF No. 148 at 29; *see id.* at 51. Assuming this does not state an implied-in-law contract theory, which Plaintiff has disclaimed, it cites no case law supporting the contention that the DFARS' policy favoring commercial computer software acquisitions absolves a claimant of presenting evidence demonstrating the elements of contract formation with respect to the commercial license it seeks to enforce under the DFARS. Indeed, at least one court has rejected a similar argument raised in an action involving alleged misappropriation of computer software provided to the United States Navy under a subcontract. *GlobeRanger Corp. v. Software AG*, 27 F. Supp. 3d 723, 752–53 (N.D. Tex. 2014) (granting summary judgment for defendant on tortious interference of contract claim where plaintiff-subcontractor did not show that the Navy agreed to the terms of its commercial license); *id.* at 753 ("In short, a fair reading of DFARS § 227.7202–1(a) is that it sets out the rules by which GlobeRanger, [the prime contractor], and the Navy *should have* agreed to limit the Navy's rights, but it does not relieve GlobeRanger of its obligation to show that the Navy actually agreed to the terms of its EULA." (emphasis in original)).

\* \* \*

In sum, Plaintiff has not established the sum certain element of its CDA claim, nor has it shown the existence of any contract with the Government to proceed on its breach of contract theories, and thus summary judgment in Defendants' favor is proper.

**C.    Defendants are Entitled to Summary Judgment on the Copyright Claim Because Plaintiff's Copyright Registrations are Invalid.**

With respect to Plaintiff's copyright infringement claim, both parties moved for summary judgment on the question of the validity of Plaintiff's copyright registrations.  One of the elements a plaintiff must establish in a copyright infringement case is "ownership of a valid copyright." *Gaylord v. United States*, 595 F.3d 1364, 1372 (Fed. Cir. 2010) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  The Copyright Act provides that "[i]n any judicial proceedings a certificate of registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."  17 U.S.C. § 410(c); *see Bruhn NewTech, Inc. v. United States*, 144 Fed. Cl. 755, 803 (2019).  Any inaccurate information in a certificate of registration will not render the certificate invalid unless "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."  17 U.S.C. § 411(b)(1); *see Unicolors*, 595 U.S. at 181.

In its motion, Plaintiff argues that its copyright registrations are presumptively valid because the USCO issued certificates of registration to Plaintiff, specifically '425 for HeS and '391 for ROVR.  ECF No. 164 at 23–24.  For both programs, the baseline source code (*i.e.*, the work) claimed in Plaintiff's applications was HeS Build 252.  ECF No. 148-4 at 224–26 (Ex. 48).

In their cross-motion, Defendants argue that Plaintiff's copyright registrations are invalid because the deposit copies submitted with its applications are not bona fide copies of the claimed

works.[10]  ECF No. 195 at 9–10, 18.  Citing to their expert's report, Defendants allege that the deposit copies contain code postdating the works' completion and publication dates, both as claimed in the copyright applications and as admitted by Plaintiff in interrogatories.  *Id.* Defendants also contend that references to third-party authors and copyright holders were deleted in the source code provided in the deposit copies.  *Id.* at 10, 18.  According to Defendants, Plaintiff knew that the deposit copies were inaccurate (*i.e.*, not bona fide copies) because Plaintiff's CEO, Mr. Greene, stated in his declaration that Plaintiff updated the code to remove these third-party references.  *Id.*  Defendants further contend that Plaintiff knew that it prepared the deposit copies using later versions of the software.  *Id.*  Citing to the Register's response to the Court's referral order, Defendants argue that the Register would have refused registration had it known that the deposit copies were not the versions of the source code identified in the applications.  *Id.* at 11–12.

In its response to Defendants' motion, Plaintiff argues that its deposit copies satisfy the USCO's requirements because a historically accurate and complete version of a prior build can be extracted from a later version of the code without reproduction or reconstruction.  ECF No. 196 at 9.  Plaintiff argues that any differences between the deposit copies and the original source code are immaterial and a necessary result of satisfying the USCO's deposit copy requirements.  *Id.* Plaintiff further argues that the issues identified by Defendants' expert are refuted by statements in Mr. Greene's declarations and thus present triable issues of fact.  *Id.* at 10–11.  According to Plaintiff, Mr. Greene completed the copyright applications to the best of his understanding, without

---

[10] Defendants also argue that the copyright registrations are invalid because Plaintiff failed to disclose and disclaim preexisting material.  ECF No. 195 at 12.  The Court's opinion focuses on the deposit copy argument because deposit copy inaccuracies cannot be corrected through supplementary registrations.  *See* 37 C.F.R. § 202.6(d)(4)(ii) (2023); ECF No. 187 at 12.

assistance of counsel, and produced the most accurate information that Plaintiff had in its possession at that time. *Id.* at 6, 11.

The Court finds that the undisputed facts show Plaintiff's copyright registrations are invalid under § 411(b)(1) because: (1) Plaintiff did not deposit bona fide copies of the works claimed in its applications for copyright registration, (2) Plaintiff admits it extracted the deposit copies from live servers in 2018 with knowledge that, by that time, the code had been updated and altered, and (3) the incorrect deposit copies, if known, would have caused the Register to refuse registration.

1.   <u>Plaintiff Deposited Inaccurate Copies of its Work in its Applications for Copyright Registration.</u>

The first part of the § 411(b)(1) analysis requires the Court to determine whether Plaintiff included inaccurate information in its applications for copyright registration.   17 U.S.C. § 411(b)(1)(A).   "To obtain registration, the author of a work must submit to the Register of Copyrights a copy of the work and an application." *Unicolors*, 595 U.S. at 181 (citing 17 U.S.C. §§ 408, 409).   Section 408 of the Copyright Act "permits the deposit of 'bona fide copies of the original work only.'" *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (quoting *Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1322 (9th Cir. 1986)).   A bona fide copy is a copy that is "virtually identical to the original and must have been produced by directly referring to the original." *Id.*   Neither a reconstruction of the work, nor a later version of the work is considered a bona fide deposit copy. *See id.*; *Torres-Negron v. J&N Records, L.L.C.*, 504 F.3d 151, 163–64 (1st Cir. 2007); *Coles v. Wonder*, 283 F.3d 798, 802 (6th Cir. 2002) (holding that a 1990 recording was not a copy, but rather a reconstruction, and therefore plaintiff did not have a valid copyright registration for the 1982 version); *Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.*,

226 F.3d 387, 393 (5th Cir. 2000) (holding that "later versions of source code" did not constitute a complete copy of original source code for purposes of copyright registration).

With respect to computer programs, the USCO provides further guidance on the deposit copy requirements. Specifically, it advises that, "[t]o register a computer program, the applicant should submit 'one copy of identifying portions' for the specific version of the program that the applicant intends to register." U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1509.1(C) (3d ed. 2017) ("Compendium") (quoting 37 C.F.R. § 202.20(c)(2)(vii)).[11] "[W]here the work has been prepared in different versions, each version constitutes a separate work." 17 U.S.C. § 101 (defining "created"); *see Bruhn*, 144 Fed. Cl. at 804; *see also* ECF No. 187 at 9–10.

Here, instead of depositing copies of the original works that Plaintiff was seeking to register, Plaintiff submitted later versions of the software containing new and altered code. Specifically, Plaintiff states that the works it registered, and for which it alleges infringement in this case, are HeS Build 252 and ROVR Build 311, which wholly incorporates the Build 252 baseline code. *See* Decl. of Barry R. Greene (Jan. 2022) ¶ 6, ECF No. 149-3; *see id.* ¶ 7 ("We know this refers to Build 252 (Version 5.2, Iteration 11) and was therefore incorporated in its entirety into later Builds, such as 311 (Version 5.2, Iteration 15), which is what we had, and what we registered."); *see also* ECF No. 148-4 at 224–26 (Ex. 48). Plaintiff has provided contradictory statements regarding the completion dates of these builds. It stated in response to interrogatories that Plaintiff completed Build 252 in 2011. *See* ECF No. 164 at 19 ("By May of 2011, HeS had created a human product, HEALTHeSTATE . . . ."); ECF No. 148-4 at 242 (identifying

---

[11] References to the Compendium are to the version released in September 2017, as it contains the governing principles the USCO would have applied at the time Plaintiff filed its applications in 2018. *See* ECF No. 187 at 6.

"Copywritten HEALTHeSTATE Version 5.2 Iteration 11 (2011)" and stating that "[a]ny derivative works, versions, copies, or developer access of HeS baseline software after 2011 contain HEALTHeSTATE Version 5.2 Iteration 11 (2011)").  In its applications and as shown on its copyright registrations, Plaintiff stated that it completed and published HeS in 2013 and ROVR in 2006.  *See* ECF No. 187 at 2–3; PMSJC Ex. 86 at 306, 309, ECF No. 164-4.  Plaintiff's supplementary registration applications reflect completion/publication dates for HeS and ROVR of 2007 and 2013, respectively.  *See* ECF No. 187 at 3.

According to Defendants' expert, Dr. Martin Walker, Plaintiff's deposit copies do not match the source code as it existed in the years claimed by Plaintiff in its copyright applications—*i.e.*, 2013 (HeS) and 2006 (ROVR).[12]  *See* Decl. of Martin Walker, Ph.D. ¶¶ 174–93, ECF No. 146-34 (opining that deposit materials do not correspond to source code for, and indicate significant development of code after, the years claimed in copyright applications).  For example, the deposit copies contain many occurrences of code added or revised in 2014, 2015, and 2017, among other years.  *See, e.g., id.* ¶¶ 180, 189, 190–92.  The deposit copies likewise do not match the source code produced in this case as Build 252 and Build 311.  *See id.* ¶¶ 211–12.  Specifically, Dr. Walker identified numerous instances where source code in the deposit copies had been altered to delete or change references to third parties as authors or copyright holders of certain code.  *See, e.g., id.* ¶¶ 201 ("involving deletion in the '391 Deposit Material of text referring to 'Capt. Kevin Helmrick, M.D., MC, USAF' or 'USAF'" as the author and substituting "HEALTHeSTATE,

---

[12] The Court's references to Dr. Walker's expert report are to sections not directly challenged by Plaintiff in its Motion in Limine to Exclude William Elkington, Dr. Martin Walker, and Cheryl LeeVan.  *See* ECF No. 168 at 10–11 (arguing that Dr. Walker relies on unsworn conversations with ASM employee), 11–12 (arguing that Dr. Walker opines on an incorrect factual assumption that ROVR does not contain the baseline code), 19 (arguing that Dr. Walker opines on legal conclusions that Plaintiff inaccurately listed the year of completion and date of publication, but not seeking to exclude his opinions regarding the deposit copies).

LLC"), 208 (detailing "at least three instances in the '425 Deposit Material in which the text 'HEALTHeSTATE, LLC' was substituted for text referring to 'SAIC' in copyright notices or similar text"). Indeed, these changes to the source code postdate any completion or publication year claimed in Plaintiff's applications for registration, in its supplementary registrations to the USCO, or in this litigation.

Plaintiff claims to refute Dr. Walker's opinion. *See* ECF No. 196 at 10–11 (citing Greene Decl. (Jan. 2022), ECF No. 149-3; Decl. of Barry R. Greene (Sept. 2022), ECF No. 196-1). However, Plaintiff's evidence does not rebut the findings laid out in Dr. Walker's report. Instead, Mr. Greene's declaration only provides reasons *why* the deposit copies are different from the original works. ECF No. 149-3 ¶ 11 (stating in response to the allegation that "the registered version of the HeS software does not exactly correspond in every way to the 'source code,'" "Well of course it doesn't, and there is a reason on the USCO website that explains this."). Mr. Greene contends that a technical mishap occurred during the extraction process and due to conversion of the source code from text files (".txt" or ".asp") to Microsoft Word (".docx"). *Id.*; *see* ECF No. 196-1 ¶¶ 3–4. However, the issues identified in Dr. Walker's report are not merely conversion or extraction issues but rather involve inclusion of various new lines of code and substitution of authorship and copyright references. Plaintiff has not presented any expert testimony either refuting Dr. Walker's opinion on those issues or explaining how conversion/extraction could result in the modifications to the source code that Dr. Walker identifies. Even the Register noted in her response to the Court's referral order that the USCO is not aware of "any technical convention that would cause a file conversion . . . to alter the text in the manner alleged by [Defendants]." ECF No. 187 at 5 n.10. Viewing Mr. Greene's declarations in the light most favorable to Plaintiff, they at best do not respond to Dr. Walker's declaration. *See Celotex*, 477 U.S. at 324 (nonmovant must

come forward with "'specific facts showing that there is a genuine issue for trial'" (quoting Fed. R. Civ. P. 56(e))). As such, Plaintiff has not adequately explained or presented "a legitimate excuse" for the inaccuracy. ECF No. 210 at 5 (quoting *Gaffney v. Muhammad Ali Enters. LLC*, No. 20 Civ. 7113, 2022 WL 4095953, at *6 (S.D.N.Y. Sept. 7, 2022)); *see PalatiumCare, Inc. v. Notify LLC*, No. 22-CV-217, 2023 WL 2929462, at *10 (E.D. Wis. Apr. 13, 2023).

Moreover, contrary to Plaintiff's characterization, Mr. Greene's declarations are consistent with Dr. Walker's opinion. Mr. Greene stated that by 2018, when he submitted the copyright applications, "[Plaintiff] had developed the code with newer patches to fix on-going production bugs for HeS's live customers and had updated the code to remove instances of references to third parties no longer relevant to specific customers' needs or functional requirements." ECF No. 149-3 ¶ 12; *see id.* ¶ 6 ("It is entirely possible that the working servers (by 2018) from which code was pulled contained newer date information[,] . . . or some newer patches[.]"). Plaintiff attempts to deflect, arguing that Defendants' motion takes Mr. Greene's statements out of context, as he was referring to changes in the context of newer patches developed by 2018. ECF No. 196 at 10–11. But Mr. Greene's declarations confirm that Plaintiff extracted the source code for the deposit copies from the live versions of the software *as of 2018*. *See* ECF No. 196-1 ¶ 3 (explaining that the code he submitted to USCO on behalf of Plaintiff was extracted from a "production environment (2 servers) hosting a live 'human' version of HeS software used by past and current HeS customers" and "a ROVR 'animal' development environment that came from the 'Driveway Disk' provided to HeS in 2014"); ECF No. 149-3 ¶ 6 ("In short, the two (2) codesets submitted to USCO were sourced from a live server whose most recent numbered code update . . . had been HeS Build 252 (the Human EHR) and a live ROVR server engineered largely from the disk given to HeS in 2014 . . . identified in 2021 as HeS Build 311[.]"). Thus, the evidence provided by

Plaintiff acknowledges that the deposit copies were not produced by directly referring to the original versions of the source code (for the years identified in either the copyright applications or this lawsuit) but rather were created from the 2018 live versions of the software that contained contemporaneous code updates and substituted references for third parties.  Indeed, the explanation for why Plaintiff extracted source code from the live servers is premised on Mr. Greene's statement that Plaintiff did not have access to the original, full development environments.[13]  *See* ECF No. 196-1 ¶ 3 (". . . HeS was prevented by the Defendants from accessing the original HeS development environment until it was surrendered by the Defendants during discovery in 2021 . . . ."); ECF No. 149-3 ¶ 6 ("The disk from Mr. Baker did not contain a complete development environment and it took us years to recreate a development environment that could support code development from version 311 and onward.").

Notwithstanding this admission, Plaintiff generally argues that its deposit copies were "virtually identical to the original [source code] in all material respects and [were] produced by directly referring to the original."  ECF No. 196 at 9 (citing ECF No. 149-3 ¶ 11); *see id.* at 14 (arguing that Plaintiff, for purposes of the deposit copies, "was not using a later version [of the source code] to recreate the original from memory, but instead extracted and submitted the original").  Citing to the report of its expert, Dr. Hassell, Plaintiff contends that "a historically accurate and complete version of a prior build can be extracted from a later version without

---

[13] Notably however, at the time it submitted its applications, Plaintiff was in possession of a disk (known as the "Driveway Disk") provided in 2014 by Mr. Andrew Baker, Plaintiff's former CEO and then-current ASM employee, ECF No. 196-1 ¶ 3, which was labeled "ROVR Build 311," *id.* ¶ 5.  Mr. Greene states that he "had no cause to question the accuracy of the Defendants' build number labeling."  *Id.*  Yet, instead of directly copying the code on the Driveway Disk, Plaintiff pulled the source code for the '391 deposit copy from the live server hosting the "veterinary version of HeS" that Plaintiff was able to create and then further develop from the disk in 2017.  *Id.* ¶ 3; ECF No. 149-3 ¶ 6.

reproduction or reconstruction, which is what occurred here." *Id.* at 9 (citing Decl. of Dr. Johnette Hassell (Jan. 2022) ¶ 5, ECF No. 164-3).  While the principle may be true enough, Plaintiff's expert did not state that she reviewed the deposit copies to confirm that actually occurred in this case, nor did she opine that the deposit copies were virtually identical to and produced by directly referring to the original source code claimed in the applications, or this lawsuit.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (holding that nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts").

Accordingly, there is no genuine issue as to any material fact on the question of whether Plaintiff submitted inaccurate deposit copies with its registration applications.  Depositing later versions of source code instead of copies of the specific version of source code for which Plaintiff sought copyright registration violated the bona fide copy requirements.

2.   Plaintiff Deposited the Inaccurate Copies with Knowledge They Were Inaccurate.

The Court must next determine whether Plaintiff submitted the deposit copies with knowledge that they were not bona fide copies of the source code it sought to register.  17 U.S.C. § 411(b)(1)(A).  In *Unicolors*, the Supreme Court held that "[l]ack of knowledge of either fact or law can excuse an inaccuracy in a copyright registration."  595 U.S. at 182.  The Court held that, in the context of § 411(b) of the Copyright Act, "the word 'knowledge' means actual, subjective awareness of both the facts and the law."  *Id.* at 185; *see id.* at 184–85 ("'[K]nowledge' has historically 'meant and still means "the fact or condition of being aware of something."'" (quoting *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020))).  Acknowledging the argument that such standard would "make it too easy for copyright holders, by claiming lack of knowledge, to avoid the consequences of an inaccurate application," the Court provided guidance for courts presented with a mistake-of-law claim.  *Id.* at 187.  As it explained, "courts need not

automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Id.* "Circumstantial evidence, including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters, may also lead a court to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information." *Id.* (citing *Intel Corp.*, 140 S. Ct. at 779 ("[A]ctual knowledge can be proved through 'inference from circumstantial evidence.'" (quoting *Framer v. Brennan*, 511 U.S. 825, 842 (1994))); *see Staples v. United States*, 511 U.S. 600, 615 n.11 (1994) ("[K]nowledge can be inferred from circumstantial evidence[.]").

       a.    *Plaintiff had knowledge of the facts that produced the inaccuracy.*

Plaintiff's evidence shows that it was aware that the deposit copies contained versions of the software that included new code and that removed references to third parties. Mr. Greene explains that the deposit copies were extracted from live servers in 2018. *See* ECF No. 149-3 ¶ 6; ECF No. 196-1 ¶¶ 3, 5. According to Mr. Greene, the live servers contained new code added to fix errors for live customers and updates to delete references to third parties. *See* ECF No. 149-3 ¶¶ 6, 12; ECF No. 196-1 ¶ 5.

While Mr. Greene denies Plaintiff intentionally altered the code for purposes of creating the deposit copies and explains that he did not have the tools to review the code in its converted Microsoft Word form before submitting the deposit copies, it does not change the fact that Plaintiff was aware that the very sources (*i.e.*, live servers) from which it extracted the code submitted to the USCO had been further developed by 2018. *See* ECF No. 149-3 ¶ 12; ECF No. 196-1 ¶¶ 3–4; *see also dmarcian, Inc. v. DMARC Advisor BV*, No. 21-cv-00067, 2023 WL 3971433, at *8 (W.D.N.C. June 12, 2023) (holding that undisputed facts showing plaintiff's deposit copy contained modified lines of code in use in 2021 rather than the code as it existed in 2012 provided

some basis for allegation that plaintiff knowingly deposited an inaccurate copy). The same conclusion is compelled regardless of Plaintiff's explanation that it did its "best with the information [it] had," ECF No. 196-1 ¶ 6, and produced the most accurate information it could at the time, *see* ECF No. 196 at 11; *see also* ECF No. 196-1 ¶ 5; ECF No. 149-3 ¶ 13. Mr. Greene's declarations simply do not state, and all reasonable inferences drawn in Plaintiff's favor do not indicate, that Plaintiff was not aware that the deposit copies had new and altered code. They only state that Mr. Greene did his best.

Accordingly, the Court finds that there is no genuine issue of material fact as to the question of whether Plaintiff had knowledge of the underlying facts that produced the inaccuracy in the deposit copies.

### b. *Plaintiff was at least willfully blind to the relevant law.*

As to whether Plaintiff lacked knowledge of the inaccuracy of its deposit copies from a legal point of view, it bears noting that Mr. Greene does not expressly state that he made a mistake of law. Specifically, he does not claim that he was unaware of the legal requirements for deposit copies containing source code, or that he was unaware that submitting a later version of the software that included new and altered code was against the deposit copy requirements. Indeed, in its supplemental brief, Plaintiff does not mention the inaccurate deposit copies at all in its attempt to argue that the circumstantial evidence here does not show the requisite level of knowledge. *See* ECF No. 207 at 7–8. Again, Mr. Greene merely asserts that he did the best he could. *See* ECF No. 196-1 ¶ 6; *see also* ECF No. 210 at 6 (arguing Mr. Greene "[tried] to submit a *substantially compliant* copy" of the HeS and ROVR source code (emphasis added)). He also goes on to state that he did "what [he] thought the USCO was asking of [him]." ECF No. 196-1 ¶ 6. Assuming this is a denial about his knowledge of the law, it is conclusory at best and thus not

sufficient to raise an issue of fact.  *See Myers Investigative & Sec. Servs., Inc.*, 47 Fed. Cl. 605, 617 (2000); *Jones v. United States*, 49 Fed. Cl. 516, 520 (2001).  Moreover, under *Unicolors*, that denial would not necessarily resolve the issue because "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." 595 U.S. at 187.  Reference to circumstantial evidence, including the resources available to Mr. Greene, is therefore appropriate.  *Id.* (courts may look to "the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters" to evaluate knowledge).

Mr. Greene states in his declarations that, in completing the applications for copyright registration, he consulted the registration instructions on the USCO's website and obtained assistance from copyright staff.  *See* ECF No. 149-3 ¶¶ 4, 11; ECF No. 196-1 ¶ 4.  Although Mr. Greene is not an attorney and did not have prior experience registering copyrights, Plaintiff submitted the applications during this litigation; therefore, Mr. Greene had access to legal assistance even if he chose to complete the applications on his own.  ECF No. 149-3 ¶ 4; ECF No. 196-1 ¶ 6.  Indeed, Plaintiff submitted the copyright registration applications in 2018 to overcome the Government's first motion to dismiss.

Regardless of whether Mr. Greene obtained assistance from counsel, interpreting the plain language of the guidance on the USCO's website regarding deposit copies requires no legal training.  *See Lieb v. Korangy Publ'g, Inc.*, No. CV 15-0040, 2022 WL 1124850, at *14 (E.D.N.Y. Apr. 14, 2022) ("While *Unicolors* broadly included [§ 411(b)(1)(A)] inaccuracies to include legal mistakes, it cannot have meant that only copyright lawyers are in a position to be held accountable for inaccuracies regarding the law.").  The relevant sections of the Compendium, which is publicly

accessible on the USCO's website, provide clear guidance on deposit copies.[14]   Since the *Unicolors* decision, numerous courts have considered the clarity (or complexity) of the applicable guidance in the Compendium in analyzing § 411(b)(1)'s knowledge requirement.  *See id.* at *13 (holding that the clarity of USCO resources available to plaintiff, including the Compendium, led to the conclusion that "only willful blindness to the law can explain the inaccuracy at issue"); *Neman Bros. & Assocs. v. Interfocus, Inc.*, No. 2:20-cv-11181, 2023 WL 115558, at *10 (C.D. Cal. Jan. 4, 2023) (noting that the "publicly accessible Compendium provided guidance" on topics relevant to the inaccuracies at issue); *PalatiumCare*, 2023 WL 2929462, at *6 (noting that the Compendium, although helpful, did not provide dispositive guidance relevant to the alleged inaccuracy and applicable case law was nonexistent).

According to the "Computer Programs" section of the Compendium,

"[T]o register a computer program, the applicant should submit 'one copy of identifying portions' for the **specific version** of the program that the applicant intends to register . . . . Specifically, the applicant should submit an identifying portion of the source code for the **particular version of the program** that the applicant intends to register."

COMPENDIUM (THIRD) § 1509.1(C) (emphasis added).  For source code specifically, applicants should "add the title and version number of the program to the first page of the code" to help the USCO "determine **whether the version described in the application matches the version shown in the identifying material**."  *Id.* § 1509.1(C)(1) (emphasis added); *see id.* § 611.1(B) (providing that "the applicant should provide the year of completion for **the specific version** that is being registered" (emphasis added)).  Additionally, the Compendium advises, under the

---

[14] The Compendium is "an administrative manual that instructs agency staff regarding their statutory and regulatory duties and provides expert guidance *to copyright applicants*, practitioners, scholars, courts, *and members of the general public* regarding Office practices and related principles of law."  ECF No. 187 at 5–6 (emphasis added).

"Refusal to Register" section, that "[t]he applicant must submit a *bona fide* copy of the work, regardless of whether the deposit consists of a complete copy, a complete phonorecord, or identifying material." *Id.* § 1503.2. It further defines "bona fide copy" as "a copy or phonorecord (i) that is virtually identical to the original copy or phonorecord of the work, and (ii) that is made from or by directly referring to the original copy or phonorecord." *Id.* (citing *Torres-Negron*, 504 F.3d at 157; *Kodadek*, 152 F.3d at 1211–12). Thus, the Compendium plainly instructs applicants that a deposit copy containing source code: (1) should be the specific version the applicant seeks to register, (2) should match the version identified in the application, and (3) must be a bona fide copy (*i.e.*, virtually identical to the original and made from or by directly referring to the original).

Depositing an inaccurate copy is a significant error because the deposit copy identifies the precise copyright work for which the applicant seeks copyright registration. *See* 17 U.S.C. § 408; ECF No. 187 at 16. As such, applicants cannot correct inaccurate deposit copies after copyright registration by providing supplementary information to the USCO. *See* ECF No. 187 at 12; COMPENDIUM (THIRD) § 1802.7(D). As the Register explained in response to the Court's referral order, "[i]f the applicant submitted the incorrect deposit copy for the version of software it sought to register, then it would be required to submit a new application for a basic registration with a deposit copy consisting of the correct version." ECF No. 187 at 18.

This case is unlike *Unicolors* where the plaintiff averred it was not aware at the time it submitted its registration application "that the 31 designs it was registering together did not satisfy the 'single unit of publication' requirement." 595 U.S. at 185. It is also unlike the cases Plaintiff cites involving good-faith mistakes made in interpreting ambiguous or complex copyright issues. *See* ECF No. 207 at 7 (citing *ReportHost, LLC v. Spectora, Inc.*, No. 22-cv-00457, 2023 WL 2782285, at *3 (D. Colo. Mar. 29, 2023)). Here, Plaintiff does not claim that it made a mistake of

law with respect to the deposit copy.  It only emphasizes that the issue of knowledge is a fact-intensive inquiry that requires the Court to "resolve genuine factual disputes at trial."  ECF No. 196 at 13 (citing Op. & Order at 9–10, ECF No. 173) (arguing that Mr. Greene's "subjective perceptions[] cannot be resolved on summary judgment exclusively by reference to third-party sources without also weighing and considering the statements refuting Defendants' allegations").  But the evidence Plaintiff has offered in opposition—Mr. Greene's declarations—does not raise *material disputes* of fact; indeed, the evidence confirms the material facts and, to the extent it attempts to refute them, provides only inadequate conclusory denials.

Accordingly, taken as a whole, Plaintiff does not raise a genuine issue of fact on the knowledge factor of § 411(b)(1).  Based on circumstantial evidence, including the significance of the legal error and the clarity of the requirements for deposit copies, the Court finds that Plaintiff was at least willfully blind to the legally inaccurate information.

3. <u>The Inaccuracies in the Applications, if Known, Would Have Caused the USCO to Refuse Registration.</u>

The remaining subsection of § 411(b)(1) requires the Court to determine whether the inaccuracy in the application, if known to the USCO, would have caused the Register to refuse registration.  Pursuant to § 411(b)(2), the Court requested the Register's advice on that question given the alleged inaccuracies in this case.  *See* ECF No. 176.  The Register's June 28, 2022, response concluded that "[i]f, as alleged, the deposit copies provided for the '425 and '391 Registrations were not the versions published on February 28, 2013[,] and January 1, 2006, respectively, as indicated on the applications, then the Office would not have registered the claims."  ECF No. 187 at 16.  As the Register explained, "the deposit copy provided must depict all elements of the work that the applicant seeks to register, which is *the specific work for which*

*the applicant has provided the year of completion and date of first publication.*"  *Id.* (emphasis added).  According to the Register, if the USCO had been aware that the works claimed in the '425 and '391 Registrations "included material added and/or altered after the publication dates indicated in the application, it would not have registered the works."  *Id.* at 2.  Therefore, the Court finds that the inaccuracies in the registration would have caused the Register to refuse registration.

\*      \*      \*

In sum, the Court concludes that there is no genuine issue of material fact as to the question of copyright validity.  Based on undisputed evidence, Plaintiff's copyright registrations are invalid under § 411 because Plaintiff submitted inaccurate deposit copies with its applications with knowledge that they were inaccurate and the inaccuracy, if known, would have caused the Register to refuse registration.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's copyright claim.

**D.    In the Alternative, Defendants are Entitled to Summary Judgment on the Copyright Claim Because the Court Excludes the Testimony of Plaintiff's Lone Copying Expert.**

In addition to demonstrating that it holds a valid copyright, a plaintiff in a copyright infringement case must prove that the defendant copied "constituent elements of the work that are original."  *Gaylord*, 595 F.3d at 1372 (quoting *Feist Publ'ns*, 499 U.S. at 361); *see Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 832 (10th Cir. 1993) ("Once the plaintiff has shown that it holds a valid copyright, it must next prove that the defendant unlawfully appropriated protected portions of the copyrighted work.").  Due to the technical nature of the analysis involved in determining copying of computer programs, "courts typically receive guidance from the parties' experts."  *SAS Inst. Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1334 (Fed. Cir. 2023) (citing *Gates Rubber*, 9 F.3d at 834–35); *see Pepper v. Int'l Gaming Sys., LLC*, 312 F. Supp. 2d 853, 861

(N.D. Miss. 2004) (noting that the application of a test to determine copying of computer programs "requires expert knowledge in the area of computer programming . . . [that is] beyond the common knowledge of both a layman and th[e] Court").  Excluding the testimony of a plaintiff's lone copying expert in a copyright infringement case involving computer programs results in the plaintiff's failure to make a showing sufficient to establish that the defendant copied constituent elements of the plaintiff's copyrighted work.  *See SAS Inst. Inc. v. World Programming Ltd.*, 496 F. Supp. 3d 1019, 1029 n.11 (E.D. Tex. 2020), *aff'd*, 64 F.4th 1319 (Fed. Cir. 2023).  In such case, the plaintiff cannot meet his burden on a copyright infringement claim, and summary judgment for the defendant is appropriate.  *See Dairyland Power*, 16 F.3d at 1202; *see also Pepper*, 312 F. Supp. 2d at 861 (granting summary judgment to defendants after excluding plaintiff's lone designated copying expert).[15]

Plaintiff offers Dr. Hassell's opening expert report as proof that Defendants copied Plaintiff's copyrighted work.  *See* ECF No. 164 at 8–9, 32–33.  Defendants filed a *Daubert* motion to exclude the expert testimony of Dr. Hassell—Plaintiff's only technical expert with regard to copying—under FRE 702, RCFC 26, and RCFC 37.  *See* ECF No. 166 at 8.  Because the Court agrees with Defendants and finds that Dr. Hassell's opinions and conclusions are unreliable and unhelpful to the Court, they must be excluded.

---

[15] Defendants did not cross-move for summary judgment on any copyright infringement element other than validity.  Nonetheless, Plaintiff had a full opportunity to brief both its motion for summary judgment on the copyright claim, which relied on Dr. Hassell's reports to support the copying element, and its opposition to Defendants' motion to exclude Dr. Hassell's reports.  Since exclusion results in Plaintiff's failure to make a prima facie claim of copyright infringement, summary judgment against Plaintiff is warranted and appropriate.  *See Celotex*, 477 U.S. at 326 ("[C]ourts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.").

1.      Dr. Hassell's Expert Reports

Plaintiff submitted three documents comprising Dr. Hassell's expert opinions: (1) an opening expert report dated January 7, 2022; (2) a second expert report dated February 11, 2022; and (3) a declaration dated March 15, 2022.  Dr. Hassell's opening report consists of two sections and two attachments.  Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 1, ECF No. 172-1.  The first section of the report is three pages long and sets forth the introduction, background, software examined, methods and outcomes, interpretations, and opinion.  *Id.* at 2–4.  The second section is 10 pages long consisting of Dr. Hassell's experience and qualifications.  *Id.* at 5–14.

Dr. Hassell states that she was retained "to opine on the provenance of the ROVR software."  *Id.* at 2–3 (¶ 3).  To do so, she received and examined the "ROVR Build 311_2.7z compressed file containing HeS Build 311 Source code."  *Id.* at 3 (¶ 6).  According to Dr. Hassell:

> Plaintiff identified several functions/features in HeS_Bld_311 that it avers were produced with non-governmental funds.  Attachment B lists some of those features. Plaintiff provided me with 14 fragments of code or phrases from HeS_Bld_311, "The HeS designated criteria", and asked that [I] opine [] as to whether or not each fragment, phrase, or representative of the fragment appears in ASM_Bld_311 and Gov_Bld_340.  I have not been asked to verify the source of the funding of these fragments.

*Id.* (¶ 8).  In Attachment B of her opening report, Dr. Hassell lists 13 (not 14) features that Plaintiff identified as produced with non-governmental funds, such as "Task Management Framework," "Import/Export Template," "Pharmacy Management," and "Full Backend Database," among others.  *Id.* at 15–16.  Under each feature, Dr. Hassell includes either a code fragment, a directory path to a file, or a keyword or phrase.[16]  *Id.*

---

[16] For the keywords and phrases, the Court infers that Dr. Hassell searched for the "Faxing System" functionality, for example, by using the phrase "fax service," as listed in Attachment B. ECF No. 172-1 at 16.  But for several of the functionalities, no specific search terms are identified or can be discerned from the code fragments and directory paths listed.

Dr. Hassell describes her methodology under the "Methods and Outcomes" part of her report, which provides in its entirety:

> For each of The HeS designated criteria, I examined the criteria for suitable search term(s). I searched the entire corpus of both ASM_Bld_311 and Gov_Bld_340 for a search term or code fragment, I documented that with the location of the hit by file path and line number. The results of these searches are in Attachment C.

*Id.* at 4 (¶ 9). In Attachment C, she includes a table that lists—for each of the 13 features—the code fragments or file names she located in her searches of Build 311 with the locations of the hits, and the corresponding code fragments or file names she located in her searches of Build 340 with the locations of such hits. *Id.* at 17–18. Dr. Hassell explains in her results sections that of the "14 functions/features from Hes_Bld_311 that Plaintiff has designated as developed with non-governmental funds, all 14 that I have searched for appear in ASM_Bld_311," *id.* at 4 (¶ 10), and "13 of the 14 that I have searched for appear in Gov_Bld_340," *id.* (¶ 11). Dr. Hassell concludes with her opinion that features and functions in Plaintiff's code are found in Defendants' code:

> It is my expert opinion that features and functions from HealtheState's ROVR that have been identified as being developed with other than government funds and that I have reviewed are found in both ASM's ROVR code and ROVR code of [t]he US Government. The absence of a hit on "ACO" in Gov_Bld_340 does not alter this opinion.

*Id.* ¶ 13.

For her second report, Dr. Hassell expands the scope of her opinion, stating that she was retained "to opine on the provenance of the ROVR, [HEALTHeFORCES], and [HEALTHeSTATE] software." Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 3 at 2 (¶ 3), ECF No. 172-3. Using the same methodology, she searched HeF Bld_78, as well as the copyrighted versions of HeS and ROVR, to document the presence or absence of terms or phrases associated with eight

modular functionalities.[17]  *Id.* (¶¶ 5–6).  Like the opening report, Dr. Hassell documents in a table—for each of the eight features—the code fragments or file names she located in her searches of the HeS and ROVR source code with the locations of the hits.  *Id.* at 18.  Unlike the opening report, she provides the exact search terms and phrases used, such as "eula".  *Id.* at 3 (¶ 4); *see id.* at 18.  Dr. Hassell states that both the HeS and ROVR source code "contained hits on each search criterion," *id.* at 4 (¶ 8), while the HeF_78 source code "ha[d] no hits for any search criterion," *id.* (¶ 10).  She therefore concludes that the eight modular functionalities appear in the HeS and ROVR source code, and they are not derived from HeF.  *Id.* (¶¶ 11–12).

In Dr. Hassell's March declaration, she corrects a statement made in her second report, clarifying that the HeF code she searched using the search criterion was "[t]he last version of HealtheForces before privately-funded functionality was added."  Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 5 ¶ 3, ECF No. 172-5.  She also includes a paragraph noting that Dr. Walker's expert rebuttal report did not rebut her conclusions, *id.* ¶ 4, as well as a paragraph explaining that the abstraction-filtration-comparison ("AFC") test would not have been necessary to her copying analysis, if she had been asked to do it, because of "the comparable implementations of the modular functionalities in each of HealtheState, ROVR, and the Government's code," *id.* ¶ 5.

2.  Dr. Hassell's Expert Opinion is Unreliable and Unhelpful to the Court.

Defendants argue that Dr. Hassell's opinions must be excluded under FRE 702 because they are not the product of reliable principles and methods and will not assist the Court in resolving any factual issues relevant to Plaintiff's claim of copyright infringement.  ECF No. 166 at 17–18.

---

[17] Given that the code provided was in Microsoft Word (.docx or .doc) files and described as the "copyrighted version," the software referenced in paragraph five may be the source code Plaintiff provided to the USCO in its deposit copies, although it is not clear from the report or briefing.

According to Defendants, Dr. Hassell's analysis exhibits three methodological flaws.  First, Dr. Hassell's opening report does not explain how she derived suitable search terms, what those search terms are, or how she performed the computerized search.  *Id.* at 18–19.  Second, Dr. Hassell does not explain why finding a hit on any of the search terms is relevant to the alleged copyright infringement.  *Id.* at 19.  Defendants contend that searching for the presence of a single word or phrase in software that contains millions of lines of code is not a recognized or reliable method of comparing software in a copyright case.  *Id.* at 20.  Third, Dr. Hassell did not account for the possibility that the portions of allegedly copied code are not protected by copyright law, which experts typically address through use of the AFC test.  *Id.* at 20–21.  Defendants further argue that, although Plaintiff repeatedly stated that the allegedly copyrighted software at issue is HeS Build 252, Dr. Hassell's opening report only analyzes ROVR Build 311 without offering a connection between Build 311 and Build 252.  *Id.* at 16–17.  Regarding Dr. Hassell's other submissions, Defendants argue that the second report is founded on the same unreliable methodology and goes beyond the proper scope of a rebuttal report, and that the March declaration is an improper sur-rebuttal with unsupported opinions, *id.* at 24, 27, 29–30.

In response, Plaintiff argues that, contrary to Defendants' characterization, Dr. Hassell searched the entire corpus of both Build 311 and Build 340 for the search terms or code fragments identified and then examined and compared the entirety of the portions of code that contained her search terms to determine copying.  ECF No. 172 at 16–17; *see id.* at 17 (arguing that "Dr. Hassell used the search terms to find the matching code and reviewed the code to conclude the code was copied").  According to Plaintiff, Dr. Hassell also identified her search terms in Attachment B of her report.  *Id.* at 15.  Plaintiff further contends that the AFC test is not legally mandated for claims involving, as here, literal copying of literal elements of software and that Dr. Hassell found it

unnecessary to perform the test because of the "comparable implementations of the modular functionalities" in the code. *Id.* at 12–13. Instead, Dr. Hassell relied on Mr. Michael Kreitzer, Plaintiff's software functionality and damages expert, who confirmed the modular functionalities as protectable elements of the source code. *Id.* at 6, 18. Finally, Plaintiff argues that the code Dr. Hassell examined contained all the information she needed to determine whether copying of Plaintiff's copyrighted code occurred because the baseline HeS code (Build 252) is wholly incorporated into Build 311 and, in any event, the examination of Build 311 is helpful to the resolution of the ultimate issues in this case because Build 311 is the copyrighted ROVR code. *Id.* at 14–15. For Dr. Hassell's second report, Plaintiff argues the report is proper rebuttal and directly refutes claims made by Defendants' expert. *Id.* at 22. Plaintiff further argues that Dr. Hassell's March declaration merely supplements her second report with a correction and makes two additional notes about her methodology without making new assertions or opinions. *Id.* at 7, 27.

The Court finds that Dr. Hassell's expert testimony is unreliable and does not help the Court determine whether copying occurred under copyright law. "[I]n order to impose liability for copyright infringement, the court must find that the defendant copied protectable elements of the plaintiff's program and that those protectable elements comprise a substantial part of the plaintiff's program when it is considered as a whole." *Gates Rubber*, 9 F.3d at 833. Copying can be shown through evidence that the defendant literally copied a protected work or, alternatively, that the defendant had access to the plaintiff's work and the allegedly infringing work is substantially similar in ideas and the expression of those ideas. *See Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1368 (Fed. Cir. 2006); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 837–38 (Fed. Cir. 1992). Here, Dr. Hassell's opening report states only that she searched Defendants' code for certain terms and documented the location of any hits. ECF

No. 172-1 at 4 (¶ 9).  She does not indicate all the search terms she used, why she chose those terms, how she conducted the search, or—importantly—whether what she found in Defendants' code is the same or substantially similar to what is in Plaintiff's code, as is necessary to prove copying.  This is clearly evidenced by the table of search results in Attachment C, which merely identifies for each feature the file names and code fragments she found in the Government's code and in Plaintiff's code.  *Id.* at 17–18.

From there, Dr. Hassell simply concludes that the 13 features and functions in Plaintiff's code are found in Defendants' code without explaining why finding a code fragment or file name using search terms automatically means that the two works contain the same or substantially similar code with respect to those features and functions.  Such conclusion is a logical leap because Dr. Hassell's report does not outline a line of reasoning that supports her findings.  *See Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) ("Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions."); *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation." (quoting *Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579–80 (11th Cir. 1985))); *see also R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010).

To illustrate, using the "Pharmacy Management" results of Dr. Hassell's Attachment C as an example, Dr. Hassell states that she found the file "FrequentlyUsedPharmacyControl.ascx" in Build 311 and the phrase "TITLE: PHARMACY REFILL ASSESSMENT" in Build 340:

| Feature | Result ASM 311 | Result 340 |
|---------|----------------|------------|
| Pharmacy Management | Found "FrequentlyUsedPharmacyControl.a scx" in ASMR\CVSROOT\history, ln105729 | "TITLE: PHARMACY REFILL ASSESSMENT" found at Gov Build 340\VOL001\NATIVES\NATIVE0 01\GOV0245817.doc, ln 19 |

ECF No. 172-1 at 18. This finding is in line with Dr. Hassell's Attachment B where she identifies "[a]ny reference to 'pharmacy'" as a specification of "Pharmacy Management." *Id.* at 16. However, showing the Court that the term "pharmacy" exists in both code sets is not a reliable way to establish copying because it does not show that the file "FrequentlyUsedPharmacyControl.ascx" exists in Plaintiff's code, nor does it show how the contents of the two files identified in Defendants' code and Plaintiff's code compare.

Although Plaintiff argues that Dr. Hassell examined the entirety of code that contains her search terms, Dr. Hassell's report plainly does not indicate that she took the next step to review and compare the portions of the source code found in each code set to determine literal copying or substantial similarity. *See Gemtron Corp. v. Saint–Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009) ("unsworn attorney argument . . . is not evidence"); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1581 (Fed. Cir. 1989). Plaintiff's argument relies on one line in Dr. Hassell's report, imbuing it with a meaning that the language cannot bear. Dr. Hassell did not state that she "examined the entirety of that code to conclude that the terms were copied," ECF No. 172 at 16; she states that "[she] searched the entire corpus of both [code sets] for a search term or code fragment, [and] documented that with the location of the hit," ECF No. 172-1 at 4 (¶ 9).

Moreover, Dr. Hassell's opening report does not indicate that she assessed whether the features and functions for which she searched are protected under copyright law. Even if copying is proven, "[l]iability for copyright infringement will only attach where *protected elements* of a

copyrighted work are copied." *Gates Rubber*, 9 F.3d at 833 (emphasis in original); *see Feist Publ'ns*, 499 U.S. at 348 ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected."); *Trek Leasing, Inc. v. United States*, 66 Fed. Cl. 8, 12 (2005) ("Once the protectable aspects of the plaintiff's work are identified, they may be compared with the allegedly infringing work to determine copyright liability.").  Dr. Hassell does not state that she examined the files or code fragments located with her search terms to determine whether they contain protected elements and to filter out any unprotected elements.  She also does not indicate why any of her search terms are relevant to identifying or determining protectable aspects of code.  Nor does she mention—at all—this facet of the legal test necessary for establishing liability under the copying element of copyright infringement.

Instead, she states that the features and functions listed in Attachment B were identified for her by Plaintiff as being produced with non-governmental funds and she accepts those features as relevant to determining copying of copyrightable works.  ECF No. 172-1 at 3 (¶ 8); *see id.* at 16, 18.  Plaintiff contends that Mr. Kreitzer's report establishes that the relevant features and functions are protected elements under copyright law.  ECF No. 172 at 6, 18.  But Mr. Kreitzer's report opines only on whether the features were built with private funds.  *See* Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 2 at 8–18, ECF No. 172-2.  Plaintiff cites no case law supporting the proposition that the source of funding used to develop features of a software program is dispositive of protectability under copyright law.  Rather, the essential factor of protectability is originality, which in the copyright context "means that the work was independently created by the author (as

opposed to copied from other works), and that it possesses at least some minimal degree of creativity."[18] *Feist Pubn's*, 499 U.S. at 345.

In the context of software programs, filtering out unprotected elements is critical to an evaluation of whether the defendant copied protected elements of a copyrighted work. As the Federal Circuit recently explained, "whether a particular component or element of a program is protected by a copyright depends on whether it qualifies as an expression of an idea, rather than the idea itself . . . . Additionally, other doctrines of copyright law detail what elements are not protectable, including scènes à faire elements, material in the public domain, factual material, and elements under the merger doctrine." *SAS*, 64 F.4th at 1326; *see Oracle Am., Inc. v. Google, Inc.*, 750 F.3d 1339, 1363 (Fed. Cir. 2014) ("In the computer context, 'the scene a faire doctrine denies protection to program elements that are dictated by external factors such as "the mechanical specifications of the computer on which a particular program is intended to run" or "widely accepted programming practices within the computer industry.""" (quoting *Softel, Inc. v. Dragon Med. and Sci. Commc'n*, 118 F.3d 955, 963 (2d Cir. 1997))).

That the features and functions identified in Dr. Hassell's report contain unprotected elements is of concern. For example, what Dr. Hassell's report identifies from Plaintiff's and Defendants' code seems largely to be file names, which in and of themselves do not establish copyrightable work. *See* U.S. Copyright Office, *Works Not Protected by Copyright*, Circular 33,

---

[18] Plaintiff argues that other non-expert evidence establishes originality. ECF No. 182 at 11–12 (discussing civilianization efforts and commercial development of HeS). Such evidence is certainly relevant to the question, but it does not on its own identify the protected elements, and filter out any unprotected elements, of the source code at issue. The Court looks to expert testimony to guide the analysis of whether copying of protectable elements of a computer program occurred. *See Gates Rubber*, 9 F.3d at 832 n.7 (agreeing that in a copyright infringement case a court should "draw upon a larger arsenal of facts" and "then analyze which portions of the program, according to the expert testimony, infringes the protected expression" (citation omitted)).

at 2 ("Words and short phrases, such as names, titles, and slogans, are uncopyrightable because they contain an insufficient amount of authorship."); *see also Oracle*, 750 F.3d at 1362. Some of the features Dr. Hassell lists in Attachment B are textual comments such as copyright notices and the EULA, ECF No. 172-1 at 15, and common computer words such as "import" and "database," *id.* at 16. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250–51 (11th Cir. 2007) ("[I]f an expert relies on uncopyrightable ideas rather than on expression of those ideas in analyzing alleged copyright infringement the report is excludable.").

Plaintiff disputes that the AFC test discussed in Defendants' brief is mandatory. ECF No. 172 at 10. But the Court need not determine whether Dr. Hassell was required to perform the AFC test, or any other particular test, because regardless of what methodology is utilized *some protectability analysis* is required, and here Dr. Hassell's reports indicate none. Contrary to Plaintiff's argument, the need to perform such analysis applies even in cases where there is literal copying of literal elements. ECF No. 178 at 14–15 & n.6 (collecting cases). And although Plaintiff nonetheless claims that all the elements of the AFC test are present in Dr. Hassell's analysis, *see* ECF No. 172 at 12, no such elements can be found in her reports because she merely searched for what Plaintiff identified as protectable elements of the software and referred to Mr. Kreitzer's report on the funding sources. As a result, Dr. Hassell's methodology does not show copying of protected elements of the code under copyright law and, as such, is unreliable and unhelpful to the Court. *See SAS*, 496 F. Supp. 3d at 1028 (excluding expert opinion where expert failed to filter out unprotectable elements of software resulting in "an improper comparison of unprotectable elements to the accused products").

Lastly, although Plaintiff states that Build 252 is the alleged copyrighted baseline source code for both the HeS and ROVR software programs, *see* ECF No. 148-4 at 224–26 (Ex. 48), Dr.

57

Hassell did not perform any analysis of Build 252.  *See La Resolana Architects, P.A. v. Reno, Inc.*, 555 F.3d 1171, 1178 (10th Cir. 2009) (infringement claim requires claimant to show the defendant "unlawfully appropriated protected portions of *the copyrighted work*" (emphasis added) (quoting *Gates Rubber*, 9 F.3d at 832)).  Plaintiff argues that Dr. Hassell's analyzing Build 311 is sufficient because Build 311 is the copyrighted ROVR software, which wholly incorporates the baseline HeS code (Build 252).  ECF No. 172 at 14.  However, the evidence Plaintiff cites in support of the latter conclusion comes from a discovery stipulation that specifically states it is "not [a] substitute for expert testimony," Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 8 at 7, ECF No. 172-8, as well as statements that do not confirm that Build 252 is contained in its entirety in Build 311, *see* Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 6 at 7–11 (Hobson Tr. 131:7–135:24), ECF No. 172-6; Pl.'s Resp. to Defs.' *Daubert* Mot. Ex. 9 at 3–4, ECF No. 172-9 (emails between the Government and ASM dated September 2012).  Dr. Hassell never states that what she reviewed in Build 311 wholly incorporates the baseline Build 252 code, and she provides no connection between or other comparison of Build 252 and Build 311.  Consequently, she does not sufficiently tie her analysis to the facts of the case.  *See Summit 6*, 802 F.3d at 1296.

Even though Dr. Hassell states in her second report that she examined the copyrighted version of HeS, that does not cure the deficiency because (1) her second report states that it is based on the methodology of searching for and documenting the location of search term hits, not reviewing and comparing the contents of the source code she found; and (2) she did not compare either the copyrighted version of HeS or ROVR to the alleged infringing code in Build 340.

As to the remaining submissions by Dr. Hassell, regardless of any procedural errors, her second report is unhelpful to the Court in determining the copying element of Plaintiff's infringement claim because the report served a different purpose—*i.e.*, supporting Plaintiff's

validity arguments. According to Plaintiff, Dr. Hassell conducted searches of the code for HeF, HeS, and ROVR to show that the latter two programs were not derived from the former and thus that HeF was properly not listed as a prior work on Plaintiff's copyright applications. ECF No. 172 at 24. In any event, as noted above, the second report is also unreliable because Dr. Hassell used the same methodology and failed to outline a line of reasoning supporting her opinions, just as in her opening report. Similarly, regardless of any procedural errors, the challenge to Dr. Hassell's March declaration is moot because that filing merely served as a supplement to her first two reports.

Because Dr. Hassell's opinions and analysis will not aid the Court in understanding the evidence or in resolving the dispute about copying, her testimony is excluded. Consequently, Defendants are entitled to summary judgment, on a separate ground from copyright invalidity, because Plaintiff cannot make a prima facie claim of infringement without the testimony of its lone copying technical expert.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment on the Breach of Contract Claim (ECF No. 145) is **GRANTED**, Defendants' Motion for Summary Judgment on the Copyright Claim (ECF No. 195) is **GRANTED**, Plaintiff's Motion for Summary Judgment on the Breach of Contract Claim (ECF No. 148) is **DENIED**, and Plaintiff's Motion for Summary Judgment on the Copyright Claim (ECF No. 164) is **DENIED**. Defendants' *Daubert* Motion to Exclude Expert Opinions and Motion to Strike Second Expert Report and March Declaration of Dr. Johnette Hassell (ECF No. 166) is **GRANTED IN PART** and **DENIED IN PART AS MOOT**. The remaining evidentiary motions (ECF Nos. 161, 168, 169) are **DENIED AS MOOT**. The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after December 7, 2023, unless the parties submit **by no later than December 4, 2023**, an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**


Dated: November 20, 2023                          _/s/ Kathryn C. Davis_
                                                  KATHRYN C. DAVIS
                                                  Judge